**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

EMW WOMEN'S SURGICAL CENTER,
P.S.C., et al.,

        Plaintiffs,

    v.

VICKIE YATES BROWN GLISSON,

        Defendant.

**Electronically filed**

Case No.:   3:17-CV-189-GNS

### PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Plaintiffs hereby move the Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a temporary restraining order and/or preliminary injunction to prevent the Commonwealth's sole abortion facility from being shut down on April 3, 2017. Specifically, Plaintiffs ask this Court to block Defendant's official capacity enforcement of KRS 216B.0435 and 902 KAR 20:360, Section 10, which requires abortion facilities to enter into a written agreement with a licensed acute-care hospital capable of treating patients with unforeseen complications, and requires abortion facilities to have a written agreement with a licensed local ambulance service for the transport of any emergency patient to the licensed acute-care hospital (hereinafter "the Requirements"). Plaintiffs have such agreements, they have been on file with the Cabinet for years, and the Cabinet has renewed Plaintiffs' license through May 31, 2017. Nevertheless, in a letter dated March 13, 2017, the Cabinet claimed that Plaintiffs' agreements contained technical deficiencies, and threatened to revoke Plaintiffs' license in 10 days, on March 24, 2017. The Cabinet granted a short extension to April 3, 2017.

As detailed more fully in the accompanying Memorandum of Law, the issuance of a temporary restraining order is warranted here.  Plaintiffs have met all of the elements required for such relief.  Plaintiffs are likely to succeed on the merits of their substantive and procedural due process claims based on controlling Supreme Court and Sixth Circuit precedent.  Plaintiffs' substantive due process claim is directly controlled by Whole Women's Health v. Hellerstedt, 136 S. Ct. 2292 (2016), which struck down a Texas law that required abortion providers to enter into business arrangements with a hospital.  The Court found that such arrangements served no medical justification, and would impose significant burdens on women seeking access to abortion by closing a number of abortion clinics in Texas.  The same is true here: abortion complications are exceedingly rare and rarely occur while a woman is at the abortion facility; such agreements are not necessary to summon an ambulance or to be seen at a hospital; and, in any event, all of Plaintiffs' physicians have admitting privileges at one or more acute-care hospitals.  And the burden on women cannot be overstated: abortion will be effectively banned in the Commonwealth if EMW Women's Surgical Center ("EMW") is forced to close.  Plaintiffs are therefore likely to succeed on the merits of their substantive due process claim.

Plaintiffs are also likely to succeed on their procedural due process claim, which is controlled by Women's Medical Professional Corporation v. Baird, 438 F.3d 595 (6th Cir. 2006).  In that case, the Sixth Circuit held that the state of Ohio violated procedural due process guarantees when it revoked an abortion clinic's license without an opportunity for a pre-deprivation hearing.  Here, the Cabinet's threat to revoke EMW's license without a pre-deprivation hearing violates the due process clause and the Cabinet's own statutory

requirement that facilities receive thirty days' notice of revocation with an opportunity for a hearing, KRS 216B.105.

The other TRO/preliminary injunction factors also weigh in favor of Plaintiffs. Indeed, enforcement of the Requirements would result in irreparable harm to Plaintiffs and their patients.  Plaintiffs' forced closure will have a devastating impact on women: some will be forced to have children against their will; others will induce abortion themselves without medical supervision.  At best, women with means will be forced to delay their abortions (increasing their expense and the health risks) as they attempt to travel out of state to get the care they need.  Moreover, the balance of equities weighs firmly in Plaintiffs' favor: there will be no harm to the Commonwealth, and blocking the enforcement of the Requirements will further the public interest.

Plaintiffs have patients scheduled for abortion care on Tuesday morning on April 4, 2017, and throughout the week, and respectfully request the emergency intervention of this Court to protect them from the immediate and irreparable injury to their, and their patients', constitutional rights.

For the foregoing reasons, and as set forth in the accompanying Memorandum, Plaintiffs respectfully request that the Court GRANT the Motion for a Temporary Restraining Order and/or Preliminary Injunction.

Date: March 29, 2017

Respectfully submitted,

/s/ Donald L. Cox
Donald L. Cox
John D. Cox
LYNCH, COX, GILMAN & GOODMAN, P.S.C.
500 W. Jefferson St., Ste. 2100
Louisville, KY 40202
doncox@lynchcox.com
jcox@lynchcox.com
(502) 589-4215

- and –

Brigitte Amiri*
New York State Bar No. 3017167
Jennifer Dalven*
New York State Bar No. 2784452
Elizabeth Watson*
California Bar No. 295221
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
bamiri@aclu.org
jdalven@aclu.org
ewatson@aclu.org
(212) 549-2633

William E. Sharp
Heather L. Gatnarek
ACLU of Kentucky
315 Guthrie Street, Suite 300
Louisville, KY 40202
sharp@aclu-ky.org
heather@aclu-ky.org
(502) 581-9746

Attorneys for Plaintiffs

*Motion for pro hac vice to be filed

4

**CERTIFICATE OF SERVICE**

I, Donald L. Cox, do hereby certify that a true and correct copy of the foregoing will be filed with the Clerk of Court using the CM/ECF system, which will serve a copy of the same upon the following counsel of record, on this 29st day of March, 2017:

I further certify that a true and correct copy of the foregoing will be served upon the following by electronic mail this same day:

Jennifer Wolsing
Assistant Counsel
**CABINET FOR HEALTH AND FAMILY SERVICES**
Office of Legal Services
275 E. Main St, 5W-B
Frankfort, KY 40621
Tele: (502) 564-7905 ext. 3414
Fax: (502) 564-7573
Jennifer.wolsing@ky.gov

Matt James
David E. Fleenor
Joseph A. Newberg, II
Justin D. Clark
La Tasha Buckner
Steven T. Mayo
Vaughn Murphy
**OFFICE OF ATTORNEY GENERAL**
700 Capital Ave., Ste. 118
Frankfort, KY 40601
Matt.james@ky.gov
david.fleenor@lrc.ky.gov
joe.newberg@ky.gov
JD.Clark@ky.gov
latasha.buckner@ky.gov, tashabuckner@yahoo.com
travis.mayo@ky.gov, jan.velez@ag.ky.gov
vaughn.murphy@lrc.ky.gov, vkmurphy97@gmail.com

M. Stephen Pitt
S. Chad Meredith
**OFFICE OF THE GOVERNOR**
700 Capital Avenue, Suite 101
Frankfort, KY 40601
Tele: (502)564-2611
Fax:  (502) 564-1275
steve.pitt@ky.gov
chad.meredith@ky.gov

_s/ Donald L. Cox_

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

EMW WOMEN'S SURGICAL CENTER,
P.S.C., et al.,

        Plaintiffs,

    v.

VICKIE YATES BROWN GLISSON,

        Defendant.

**Electronically filed**

Case No.:

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

i

## TABLE OF CONTENTS

**INTRODUCTION**............................................................................................
**1**

**FACTS** ........................................................................................................
**3**

    **Statutory and Regulatory
Background**..................................................................................................
**3**

    **Abortion Nationally and at
EMW  4**

    **EMW's Agreements and the Cabinet's
actions** .......................................................................................................
**6**

**ARGUMENT** ................................................................................................
**9**

        **I. Plaintiffs Are Substantially Likely to Succeed on the Merits of Their
Claims**........................................................................................................
**10**

        **A. Plaintiffs Are Likely to Succeed on Their Substantive Due Process
Claim.** ........................................................................................................
**10**

        **B. Shuttering EMW With Ten Days' Notice and No Hearing Violates the
Due Process
Clause.** ......................................................................................................
**14**

        **II. Enforcement of the Hospital and Ambulance Requirements Will
Impose Irreparable Harm to Plaintiffs and Their Patients in the Absence
of a Temporary Restraining
Order**.........................................................................................................
**16**

ii

**III. Neither Defendants Nor Anyone Else Will Suffer Substantial Harm if a Temporary Restraining Order and/or Preliminary Injunction Is Issued. ............................................................................................................. 17**

**IV.The Public Interest Favors Entering a Temporary Restraining Order and/or Preliminary Injunction ........................................................................................................... 18**

**CONCLUSION ............................................................................................................... 18**

**INTRODUCTION**

Absent a temporary restraining order or preliminary injunction from this Court, the Cabinet for Health and Family Services ("the Cabinet"), will revoke the license and thus shut down the sole licensed abortion facility in Kentucky on April 3, 2017, thereby effectively banning abortion in the Commonwealth.  Defendant's actions will have a devastating impact on Kentucky women: some will be forced to have children against their will; others will induce abortion themselves without medical supervision.  At best, women with means will be forced to delay their abortions (increasing their expense and the health risks) as they attempt to travel out of state to get the care they need.  And the Cabinet will impose these harms on women without a medical justification for its actions. Under directly controlling Supreme Court precedent, Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292 (2016), the Cabinet's actions are blatantly unconstitutional and must be enjoined.

This action arises because of the Cabinet's attempt to enforce an unnecessary Kentucky law that requires licensed abortion facilities to have agreements with a local acute-care hospital and an ambulance company to transfer a patient from the facility to the hospital in an emergency (the "Requirements").  These Requirements lack any medical justification because, among other things, the possibility of an abortion complication is exceedingly remote, and complications rarely occur while a woman is at the abortion facility.  Thus, agreements are not necessary to summon an ambulance or to be seen at a hospital; and, in any event, all of Plaintiffs' physicians have admitting

1

privileges at one or more acute-care hospitals.  Nonetheless, Plaintiffs have had such

agreements on file with the Cabinet for years (the "Agreements").  Indeed, as recently

as April of 2016, the Cabinet conducted a review of Plaintiff EMW Surgical Center's

("EMW's") license, judged these Agreements to be sufficient, and unconditionally

renewed EMW's license through May 31, 2017.  Nonetheless, out of the blue on March

13, 2017—just 10 days before a hearing in another case brought by EMW against the

Cabinet challenging a new abortion restriction—the Cabinet sent a letter to EMW

stating, *for the first time*, that the Agreements contained technical deficiencies, and

threatening to revoke EMW's license in 10 days.  The Cabinet granted a short extension

to April 3, 2017.

The Requirements directly contravene the Supreme Court's recent decision in

Whole Woman's Health, 136 S. Ct. 2292.  In that case, the Court struck down a similar

Texas law purportedly designed to "ensure that women have easy access to a hospital

should complications arise during an abortion procedure."  Id. at 2311.  The Court found

a "virtual absence of any health benefit" from the law and found that the law led to

closure of approximately half the clinics in the state, which meant longer driving

distances, "fewer doctors, longer waiting times, and increased crowding."  Id. at 2313.

The Court thus determined that the law imposed an unconstitutional undue burden.  Id.

The Requirements at issue here, like the Texas law, have no medical

justification, and enforcement of them will have even more drastic results than in Texas.

Women won't just have fewer options to obtain abortion as they did under the Texas

law; Kentucky women will be without a single clinic in the Commonwealth.

2

In addition, under controlling Sixth Circuit precedent, the Cabinet's sudden about-face and threat of immediate license revocation, without a pre-deprivation hearing, violates Plaintiffs' rights to procedural due process under the federal Constitution, see Women's Med. Prof'l Corp., v. Baird, 438 F.3d 595, 611-13 (6th Cir. 2006), as well as state law, KRS 216B.105.

For these reasons, Plaintiffs are highly likely to succeed on the merits of their claim.  In order to prevent immediate irreparable harm to Plaintiffs' and their patients—including effectively banning abortion in Kentucky—this Court must immediately enter a restraining order or preliminary injunction preventing Defendant from enforcing the Requirements.  Plaintiffs are scheduled to see patients on April 4, 2017, and thereafter throughout the week.

## FACTS

### Statutory and Regulatory Background

Kentucky law requires abortion facilities to "enter into a written agreement with a licensed acute-care hospital capable of treating patients with unforeseen complications related to an abortion facility procedure by which agreement the hospital agrees to accept and treat these patients."  KRS 216B.0435.  The same statute also requires abortion facilities to "enter into a written agreement with a licensed local ambulance service for the transport of any emergency patient" to the licensed acute-care hospital. Id.  The Agreements must "be filed by the abortion facility with the cabinet."  Id.; see also 902 KAR 20:360, Sec. 10.  Neither the statutes nor the corresponding regulations

3

provide any further detail about what must be included in the agreements or who must sign them.

Minor or technical deficiencies do not warrant license revocation. Under the Cabinet's regulations, "a regulatory violation identified during an inspection shall be transmitted in writing to the facility by the inspecting agency." 902 KAR 20:360, Sec. 2 (4)(c). "The facility shall submit a written plan for the elimination or correction of the regulatory violation to the inspecting agency within ten (10) days." Id. (4)(d). Following review of the plan, the agency shall notify the facility of the acceptability of the plan, and if it is unacceptable, the agency shall give the facility ten days to modify the plan. Id. License revocation is only appropriate "in any case in which it finds that there has been a *substantial* failure to comply with" the Requirements. KRS 216B.105 (emphasis added). A license revocation shall become final and conclusive thirty days after notice is given, unless the health care facility requests a hearing. Id.

### Abortion Nationally and at EMW

As the Supreme Court recognized just last year, abortion is exceedingly safe. Whole Woman's Health, 136 S. Ct at 2311. It is the one of the safest procedures in contemporary medical practice, and is substantially safer than continuing a pregnancy through to childbirth. Compl. ¶ 25.

Approximately 80% of abortions provided at EMW are performed in the first trimester of pregnancy. Id. ¶ 27. EMW provides two types of abortion: medication abortion, which comprises about 45% of the abortions EMW provides, and surgical abortion, which comprises the remainder. Id. ¶ 28. Medication abortion is a method of

4

ending an early pregnancy by taking medications at home that cause the woman to undergo a procedure similar to an early miscarriage.  Id. ¶ 29.  Surgical abortion, despite its name, is not a typical surgical procedure: it does not involve any incision.  Id. ¶ 30.

Because abortion is so safe, the vast majority of abortions in the United States can be and are safely provided in an outpatient setting.  Id. ¶ 31.  Nationwide, less than 0.3% of abortion patients experience a complication requiring hospitalization.  Id.; see also Whole Woman's Health, 136 S. Ct. at 2311.  EMW's rate is even lower.  Compl. ¶ 31.

Even though abortion rarely results in complications, Plaintiffs provide high quality care in the rare event that it does.  Most of the rare complications can and are safely and appropriately handled in the outpatient setting.  Id. ¶ 32.  As the Supreme Court also recognized, those few complications requiring hospitalization generally do not occur while the patient is still at the abortion facility.  Whole Woman's Health, 136 S. Ct. at 2311.  Thus, the number of cases in which a need for a transfer agreement with a hospital or an ambulance could even conceivably be relevant is vanishingly small.

In the exceedingly rare case that a patient requires hospital-based care while she is still at the clinic, Plaintiffs' protocols and practices ensure that the patient receives the necessary, quality care.  Compl. ¶ 34.  Although unnecessary for patient care, EMW staff physicians have admitting privileges at the University of Louisville and Norton Hospitals, both of which are acute-care facilities and are located within 1 mile of EMW, thus making transfer agreements completely superfluous.  Id. ¶ 34.  However, regardless of whether a clinic has an agreement with a local hospital or admitting privileges, appropriate care is also ensured because hospitals provide necessary care to patients who need it.  Id. ¶ 35.

Indeed, hospitals *must* comply with the federal Emergency Medical Treatment & Labor Act, which requires hospitals to treat and stabilize all emergency patients. 42 U.S.C. § 1395dd(b) (commonly referred to as EMTALA). Nor is an agreement with an ambulance company required to protect a patient's health. EMW – or any person in Louisville, where EMW is located – can simply call 911 and ask for an ambulance. Compl. ¶ 36. An ambulance will be dispatched by Metro Louisville government EMS Service to the person's location, and will transport the person to a hospital. Id. All patients in need of transportation are accepted regardless of their financial situation. Id.

Given all these factors, the Requirements are entirely unnecessary for the protection of patients' health.

### EMW's Agreements and the Cabinet's actions

Despite the lack of any medication justification for the Requirements, Plaintiffs have obtained and filed with the Cabinet the necessary agreements. Plaintiffs' current hospital agreement has been in place since 2014. Compl. ¶ 38. It is signed by the Chair of the University of Louisville Department of Obstetrics, Gynecology and Women's Health, who has the contractual authority for determining the manner in which OB-GYN services are provided at University of Louisville Hospital. Id. The ambulance agreement has been in place since 2008. Id. ¶ 39. Under that agreement, the ambulance company "agrees to continue to provide medical transportation to EMW Women's Surgical Center patients." Id. Ex. D.

As recently as April 2016, the Cabinet reviewed EMW's compliance with all relevant statutory and regulatory requirements, including the Requirements at issue here,

6

determined that EMW satisfied the relevant requirements, and renewed EMW's license until May 31, 2017. Id. ¶ 40.

Despite these facts, on March 13, 2017, the Cabinet sent EMW a letter stating its view that the Agreements were deficient in various ways, and that the clinic's license would be revoked within 10 days if those deficiencies were not rectified. Specifically, the Cabinet suddenly determined that the hospital agreement EMW had had on file for more than 3 years was not sufficient because the Cabinet alleged, without proof, that the Chair of the Department lacked authority to enter the agreement. Id. ¶ 42. The Cabinet also alleged that EMW's ambulance agreement, a version of which had been in place for more than eight years, was likewise suddenly deficient because it "does not mandate with reasonable certainty the transport of the licensee's patients to the Transfer Agreement named entity . . . In fact, its terms are no more than an offer to provide a response time, upon being contacted, thus providing no certainty of transport for an emergency patient to the purported transfer hospital."[1] Id. ¶ 43.

Plaintiffs asked the Cabinet for clarification on the alleged deficiencies. Id. ¶ 46. In response, the Cabinet sent a letter dated March 23, 2017, in which the Cabinet established new parameters – not found in the statute or regulation – for compliance with the Requirements. Id. Notably, as to who must sign the hospital agreement, the March 23 letter says that the "Cabinet required [sic] the transfer agreement to [sic] between the

---

[1] While Plaintiffs believe that the agreement in place on March 13 met all relevant legal requirements, Plaintiffs have nonetheless secured a new agreement with the ambulance company that cures the alleged deficiencies. (That agreement is attached as **Exhibit D** to the Complaint and will be filed with the Cabinet imminently.)

abortion facility licensee and the *owner of the acute care hospital, not a subordinate division etc. of it.*"  Id. ¶ 46, Ex. E (emphasis added).

While Plaintiffs believe that the hospital agreement in place on March 13 meets all the relevant legal requirements, Plaintiffs nevertheless attempted to secure an additional signature on the agreement with the University of Louisville Hospital.  Id. ¶ 45.  Plaintiffs obtained a signature from the interim president and CEO of University Medical Center, Ken Marshall, on the hospital agreement, but Mr. Marshall then asked that the amended agreement not be sent to the Cabinet shortly after signing it.  Id. ¶ 47.  In any event, it does not appear that the Cabinet, under the newly issued March 23 guidelines for compliance, would accept that signature given that Mr. Marshall is not the "owner" of the hospital.

Despite the fact that Kentucky law permits license revocation only "in any case in which . . . there has been a *substantial* failure to comply with" the Requirements, and that Kentucky law states that a revocation shall not become final and conclusive until thirty days after notice is given, unless the health care facility requests a hearing, KRS 216B.105 (emphasis added), the Cabinet's letter informed EMW that it "shall have (10) calendar days to cure the two stated deficiencies by filing . . . a compliant Transfer Agreement and Transportation Agreement.  *Failure to cure these deficiencies **will** result in an immediate revocation of the Abortion Facility license.*"  Compl. ¶ 45, Ex. C at 2 (emphasis added).  No statutory authority for this immediate revocation exists.

The timing of the Cabinet's letter is also deeply suspicious.  It was sent ten days before a temporary restraining order hearing was held on EMW's challenge against the

Cabinet to H.B. 2, a newly enacted forced ultrasound law.  <u>EMW Women's Surgical Center, P.S.C. v. Beshear</u>, No. 17-cv-00016-DJH (W.D.K.Y.); Compl. ¶ 46.

## ARGUMENT

The standard for evaluating a request for a temporary restraining order or preliminary injunction under Rule 65 is well established in this Circuit.  Though there is no "rigid and comprehensive test" for determining the appropriateness of this relief, <u>Tate v. Frey</u>, 735 F.2d 986, 990 (6th Cir. 1984) (quotation marks and citation omitted), the Court should consider the following four factors:

(1)     Whether the party seeking the injunction has shown a substantial likelihood of success on the merits;

(2)     Whether the party seeking the injunction will suffer irreparable harm absent the injunction;

(3)     Whether the injunction will cause others to suffer substantial harm;

(4)     Whether the public interest would be served by the preliminary injunction.

<u>Memphis Planned Parenthood, Inc. v. Sundquist</u>, 175 F.3d 456, 460 (6th Cir. 1999) (quotation marks and citation omitted); <u>see also</u> <u>Wilson v. Gordon</u>, 822 F.3d 934, 952 (6th Cir. 2016) ("[The court] must balance four factors in deciding whether to issue a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.") (quotation marks and citation omitted); <u>Ohio Republican Party v. Brunner</u>, 543 F.3d 357, 361 (6th Cir. 2008) (the standard for whether to issue a temporary restraining order is the same as the preliminary injunction standard).

These factors are "to be balanced and [are] not prerequisites that must be satisfied . . . . [T]hey are not meant to be rigid and unbending requirements." McPherson v. Mich. High Sch. Athletic Ass'n, 119 F.3d 453, 459 (6th Cir. 1997) (en banc) (citation omitted); see also Liberty Coins, LLC v. Goodman, 748 F.3d 682, 690 (6th Cir. 2014) ("Each of these factors should be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction.") (internal quotation marks, alternation, and citation omitted). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." Ne. Ohio Coal. for Homeless v. Husted, 696 F.3d 580, 591 (6th Cir. 2012) (citation omitted). As set forth below, Plaintiffs meet this test. Plaintiffs' likelihood of success on the merits, irreparable harm, the balance of hardships, and the public interest all strongly favor the issuance of a temporary restraining order.

**I.     Plaintiffs Are Substantially Likely to Succeed on the Merits of Their Claims.**

> **A. Plaintiffs Are Likely to Succeed on Their Substantive Due Process Claim.**

This case fits squarely in the holding of Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292. In that case, the Court struck down two restrictions on abortion that the State of Texas claimed advanced an interest in patient health and safety: (1) a requirement that all abortions clinics be classified as ambulatory surgical centers ("Texas ASC Law"), and (2) a requirement that all abortion providers have admitting privileges at a local hospital ("Texas Admitting Privileges Law"). Id. The hospital and ambulance agreements

10

challenged here impose even more extraordinary burdens on women – essentially banning abortion in the Commonwealth – without any corresponding medical benefit. Plaintiffs are therefore substantially likely to prevail on the merits.

As the Supreme Court recently reaffirmed, "there 'exists' an 'undue burden' on a woman's right to decide to have an abortion, and consequently a provision of law is constitutionally invalid, if the 'purpose or effect' of the provision 'is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" Id. at 2300 (quoting Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 878 (1992) (emphasis omitted).  The undue burden test "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer," and a law may not be upheld unless the benefits of the justification outweigh the burdens it imposes. Id. at 2309; accord, e.g., Planned Parenthood Ariz., Inc. v. Humble, 753 F.3d 905, 913 (9th Cir. 2014) ("[W]e must weigh the burdens against the state's justification, asking whether and to what extent the challenged regulation actually advances the state's interests."); Planned Parenthood of Wisc., Inc. v. Van Hollen, 738 F.3d 786, 798 (7th Cir. 2013) ("The feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous.").

After weighing the burdens of the Kentucky law with its purported medical benefits, it is clear that the law fails the undue burden test.  The burden here – closure of the Commonwealth's sole abortion facility – far exceeds the burdens in Whole Woman's Health.  The Court in that case considered the effect the Texas law would create on access to abortion, including forcing clinics to close, which meant increased driving

distances, "fewer doctors, longer waiting times, and increased crowding."  136 S. Ct. at

2313.  Here, the burden on women seeking abortion is far more extreme: there would be

*no abortion facility at all* in Kentucky.  As a result, women may attempt to induce abortion

without medical supervision, others will be forced to delay their abortions as they attempt

to travel hundreds of miles out of state for care; others will be forced to carry their

pregnancies to term against their will.  Essentially, abortion will be banned in the

Commonwealth.

As to the medical benefit side of the equation, the Court held that business

arrangements with a hospital to admit patients serve no medical benefit.  Id.; see also id.

at 2311 (finding that the purported purpose of Texas requirement was to "help ensure that

women have easy access to a hospital should complications arise," but that the law

"brought about no such health-related benefit"); Planned Parenthood of Wis., Inc. v. Van

Hollen, 94 F. Supp. 3d 949, 993 (W.D. Wis. 2015) ("Van Hollen III"), aff'd sub nom.

Schimel, 806 F.3d 908 (7th Cir. 2015); Planned Parenthood Se., Inc. v. Strange, 33 F.

Supp. 3d 1330, 1378 (M.D. Ala. 2014).  In reaching this conclusion, the Court in Whole

Woman's Health credited the district court's findings related to abortion safety and the

lack of medical justification for requiring hospital admitting privileges.  136 S. Ct. at 2310-

11.  For example, out of "five peer-reviewed studies on abortion complications in the first

trimester" the highest rate of major complications "was less than one-quarter of 1%."  Id.

at 2311.  Similarly, figures in three peer-reviewed studies showed that the highest rate of

complication for the much rarer second-trimester abortion "was less than one-half of 1%."

Id.  Moreover, complications requiring hospital admission, much less immediate transfer

to a hospital, are rarer still.  Id. (citing study showing that out of 54,911 abortion patients

only 15 required hospital admission on the day of the abortion).  Thus, the Court explained

that even in the extraordinarily rare instances in which hospitalization is required, "it is

extremely unlikely" that the complication will occur at the clinic.  Id. (internal quotation

marks omitted).  This is so with respect to medication abortion because the abortion and,

thus any complications, "almost always occur[] after the patient has left the abortion

facility," and with respect to surgical abortions because "most of these complications [that

require hospitalization] occur in the days after the abortion, not on the spot."  Id.  The

Court also recognized the district court's findings based on expert testimony that showed

that "the quality of care that the patient receives is not affected by whether the abortion

provider has admitting privileges at the hospital."  Id. (internal quotations omitted).

Accordingly, the Court concluded that there was a "virtual absence of any health benefit"

conferred by the Texas requirement.  Id. at 2313.

The same is true here.  Complications for abortion are very remote.  Even rarer

still are those instances in which a patient experiences a complication requiring immediate

transportation from the clinic to a hospital.  Nationwide, less than 0.3% of abortion patients

experience a complication requiring hospitalization on the day of the abortion.  Compl. ¶

31.  EMW's complication rate is even lower.  Id.  And, in those rare instances where a

transfer is required from the clinic to the hospital, EMW's protocols are more than

sufficient to ensure the transfer occurs safely and efficiently.  Id. ¶ 34.  Moreover, although

not required for proper patient care, EMW staff physicians have admitting privileges at

one or more hospitals, thus making a transfer agreement superfluous.  Id.  And, although

13

EMW has agreements with the hospital and ambulance company in place for years and all of Plaintiffs doctors have admitting privileges at nearby hospitals, none of these agreements are in fact necessary to ensure proper patient care:  As noted above, hospitals are required by federal law to accept patients presenting in an emergency, see 42 U.S.C. § 1395dd(b), and anyone can summon an ambulance by simply calling 911. See Whole Woman's Health, 136 S. Ct. at 2311-12 (noting consensus of courts that found no health benefit from admitting privileges requirements).

For all of these reasons, the Requirements impose the most stringent burdens – closing the only abortion facility in the Commonwealth – yet confer no medical benefits. This plainly constitutes an undue burden and therefore Plaintiffs are extremely likely to prevail on the merits.

### B.  Shuttering EMW With No Hearing Violates the Due Process Clause.

The Cabinet is threatening to shut down EMW without an opportunity for a pre-deprivation hearing.  Such action is unconstitutional under controlling law in the Sixth Circuit.  In Women's Medical Professional Corp. v. Baird, 438 F.3d 595 (6th Cir. 2006), the court held that the Ohio Department of Health had violated an abortion provider's right to procedural due process by abruptly denying its license and forcing the clinic to shut down immediately, without any opportunity for pre-deprivation review.  Id. at 613. The court explained that "[t]he case law contemplates at a minimum some chance to react to proposed governmental action before deprivation occurs."  Id. at 614 (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 547 (1985)).

To establish a procedural due process claim, a plaintiff must show "(1) that it had

14

a life, liberty, or property interested protected by the Due Process Clause of the Fourteenth Amendment; (2) that it was deprived of that protected interest within the meaning of the due process clause; and (3) that the state did not afford it adequate procedural rights before depriving it of its protected interest." Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio, 610 F.3d 340, 349 (6th Cir. 2010).  As discussed below, and for the reasons in Baird, Plaintiffs meet all three of these elements

First, it is settled in Baird that owners of an abortion facility have a protected interest in the continued operation of their abortion facility.  438 F.3d at 611.  In Baird, the court held that "due process protects an interest in the continued operation of an existing business," and that the owner of the abortion facility "ha[s] a protected property interest in the continued operation of the [] clinic." Id. at 611-12.

Second, the Cabinet's actions will, in the absence of an injunction, deprive Plaintiffs of their protected interests under the Due Process Clause.  Again, Baird is instructive.  In that case, after denying the abortion facility's license, the Ohio Department of Health issued a cease-and-desist order requiring the facility to shut down immediately. Id. at 613.  The Sixth Circuit held that the cease-and desist order deprived the owner of the facility of his protected interests in operating his business.  Id.

Third, EMW will have no opportunity for a hearing before the Cabinet forces it to close their doors.  The key requirement of the Due Process Clause is that an individual must generally be provided with the opportunity for a hearing "*before* he is deprived of any significant property interest." Loudermill, 470 U.S. at 542 (internal quotation marks omitted) (emphasis added).  In those situations where the State "feasibly can provide a

15

predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." Zinermon v. Burch, 494 U.S. 113, 132 (1990) (citations omitted).  In Baird, the Sixth Circuit applied this clear precedent and held that the cease and desist order requiring the abortion facility to immediately shut down without any hearing did not provide the facility with adequate procedural protections.  438 F.3d at 613.  The court further held that "a pre-deprivation hearing would not have been unduly burdensome, especially given the property interest at stake, namely continued operation of business." Id.  In light of the property interests involved, the minimal burden a hearing would have imposed, and the anticipated nature of the deprivation, the court held that "the post-deprivation remedy of a hearing on the proposed license denial does not satisfy procedural due process." Id. (citing Zinermon).

Here, as in Baird, Plaintiffs have a significant interest in their license and the continued operation of their abortion facility, and there is no countervailing state interest served by immediately shutting down EMW without providing pre-deprivation review. There is no suggestion, nor could there be, that the alleged technical infirmities in the agreements threaten women's health.  Indeed, such a suggestion is belied by the fact that these agreements have been in place, and accepted by the Cabinet, for years. Absent an injunction, abortion services in Kentucky will be eliminated immediately, and without any semblance of procedural due process.  Plaintiffs have therefore established a substantial likelihood of success on the merits of their procedural due process claim.

**II.    Enforcement of the Hospital and Ambulance Requirements Will Impose Irreparable Harm to Plaintiffs and Their Patients in the Absence of a Temporary Restraining Order.**

16

Unless they are enjoined, the enforcement of the Requirements will cause immediate and irreparable harm to Plaintiffs' patients. This harm cannot be overstated. Women in Kentucky will be deprived of their constitutional right to access safe and legal abortion in the Commonwealth. As a result, some women will be forced to delay their abortions as they attempt to travel long distances out of state, others will attempt to induce abortion without medical supervision, and other women will be forced to carry their pregnancies to term, even when the pregnancy carries risks to the woman's health. Compl. ¶ 50. Moreover, as the Sixth Circuit has recognized, when a constitutional right is being threatened or impaired, a finding of irreparable harm is mandated. Bonnell v. Lorenzo, 241 F.3d 800, 809 (6th Cir. 2001) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976)); see also Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati, 822 F.2d 1390, 1400 (6th Cir. 1987) (finding irreparable injury where plaintiff has shown substantial likelihood of success on merits of constitutional challenge to abortion regulation).

## III. Neither Defendants Nor Anyone Else Will Suffer Substantial Harm if a Temporary Restraining Order and/or Preliminary Injunction Is Issued.

The balance of equities also weighs heavily in favor of temporarily restraining the enforcement of the Requirements. While Plaintiffs' patients will suffer grievous harm in the absence of a temporary restraining order, Defendants will face *no* injury if the status quo is temporarily preserved. EMW has been operating with the same hospital agreement since 2014, and the same ambulance agreement since 2008. There is no

indication that the technicalities that the Cabinet identified suddenly pose a danger to patients' health.[2]

## IV.     The Public Interest Favors Entering a Temporary Restraining Order and/or Preliminary Injunction

Finally, entering an injunction here will serve the public interest.  There is a strong public interest in ensuring that women have the ability to access abortion.  Moreover, "the public interest is promoted by the robust enforcement of constitutional rights."   Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp., 698 F.3d 885, 896 (6th Cir. 2012).  The only way to ensure that Plaintiff's patients' constitutional rights are not denied, and that their health is protected, is by enjoining enforcement of the Requirements.

## CONCLUSION

For all the foregoing reasons, Plaintiffs' motion for a temporary restraining order and/or preliminary injunction should be granted.


 Date: March 29, 2017

Respectfully submitted,

*/s/ Donald L. Cox*
Donald L. Cox

---

[2] Nor could Defendant reasonably make such a suggestion where these agreements have been in place for years and approved by the Cabinet in the past.  Moreover, as noted above, federal law requires that hospitals accept patients in emergencies and ambulance services are available by picking up the phone.  In addition, all of the doctors practicing at EMW have admitting privileges at local hospitals and Plaintiffs have recently secured a new ambulance agreement that cures any imagined deficiencies with the old agreement.

John D. Cox
LYNCH,  COX,  GILMAN  &  GOODMAN,
P.S.C.
500 W. Jefferson St., Ste. 2100
Louisville, KY 40202
doncox@lynchcox.com
jcox@lynchcox.com
(502) 589-4215

- and –

Brigitte Amiri*
New York State Bar No. 3017167
Jennifer Dalven*
New  York  State  Bar  No.  2784452
Elizabeth Watson*
California Bar No. 295221
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
bamiri@aclu.org
jdalven@aclu.org
ewatson@aclu.org
(212) 549-2633




William E. Sharp
Heather L. Gatnarek
ACLU of Kentucky
315 Guthrie Street, Suite 300
Louisville, KY 40202
sharp@aclu-ky.org
heather@aclu-ky.org
(502) 581-9746

*Attorneys for Plaintiffs*

*Motion for pro hac vice to be filed*

19

20