UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:17-CV-00189-GNS

EMW WOMEN'S SURGICAL CENTER,
P.S.C., on behalf of itself, its staff, and its
patients; and ERNEST MARSHALL, M.D.,
on behalf of himself and his patients                                    PLAINTIFFS

and

PLANNED PARENTHOOD
OF INDIANA AND KENTUCKY, INC.                          INTERVENOR-PLAINTIFF

v.

VICKIE YATES BROWN GLISSON,
in her official capacity as Secretary of the
Cabinet for Health and Family Services; and
MATTHEW BEVIN, in his official capacity
as Governor of Kentucky                                                   DEFENDANTS

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

## I.      OVERVIEW

### A.      Introduction

At issue in this case is the constitutionality of a Kentucky statute—KRS 216B.0435—and

its implementing administrative regulation—902 KAR 20:360 Section 10—which require

abortion facilities to maintain transfer agreements with local hospitals and transport agreements

with ambulance services to ensure provision of emergency care to patients experiencing

complications following abortion procedures.  Under consideration is the determination whether

the benefits to the health of abortion patients from the required agreements are outweighed by

the burden on the availability of abortion services in Kentucky.  *See Whole Woman's Health v.*

*Hellerstedt*, 136 S. Ct. 2292, 2310 (2016).  The evidence presented here establishes clearly that

the scant medical benefits from transfer and transport agreements are far outweighed by the burden imposed on Kentucky women seeking abortions, such that the challenged laws impermissibly "place[] a substantial obstacle in the path of women seeking a previability abortion [and] constitute[] an undue burden on abortion access." *Id.* at 2300.

B. **Legislative History**

While this lawsuit largely involves events occurring in 2016 and 2017, the genesis of this dispute occurred more than twenty years ago. In the 1990s, members of the Kentucky General Assembly were appalled by the conditions in some abortion clinics in Kentucky—especially a facility run by a notorious abortion provider named Dr. Ronachai Banchongmanie. (Defs.' Post-Trial Br. 3, DN 90). As characterized by Defendants:

> [Dr. Banchongmanie] was able to engage in unsafe practices due to the complete lack of regulations governing abortion clinics at the time. In a previous legislative session, numerous women had testified about their horrifying experiences at Dr. Banchongmanie's clinic. In one disturbing example, a patient testified that she was able to find her way to the patient recovery room by following the bloody footprints from the surgery room.

(Defs.' Post-Trial Br. 3 (citation omitted)).

To address this issue, the Kentucky General Assembly proposed legislation to regulate abortion facilities during the 1998 legislative session.[1] Although the original bill contemplated regulating abortion facilities like ambulatory surgical centers ("ASCs"), the intent of the final version of Senate Bill 217 was to hold abortion facilities to a lower standard than ASCs. (Defs.' Trial Ex. DX25C, 31:25-33:04). The stated effort to provide oversight of abortion clinics was

---

[1] During that same legislative session, the Kentucky General Assembly also enacted a law banning partial birth abortions except when "necessary to save the life of the mother whose life was endangered by a physical disorder, illness, or injury . . . ." Act of Apr. 14, 1998, ch. 578, §§ 1-4, 1998 Ky. Acts 3481, 3481-85. This Court later struck down that ban as unconstitutional. *See Eubanks v. Stengel*, 28 F. Supp. 2d 1024, 1033-37 (W.D. Ky. 1998), *aff'd*, 224 F.3d 576 (6th Cir. 2000).

tempered by the expectation that hospitals would readily be willing to enter into transfer agreements for abortion patients.  (Defs.' Trial Br. Ex. 4, at 1-6, DN 90-4; Defs.' Trial Ex. DX25C, 31:28-38:28, 40:07-44:33).  At the time, the House Judiciary Committee chairman stated his belief that the requirement of transfer agreements would not be an impediment to licensure because multiple hospitals would likely enter into transfer agreements with abortion facilities.  (Defs.' Trial Ex. DX25C, 40:07-44:33).  Contrary to that belief, however, during the period pertinent to this litigation all Kentucky hospitals in the Louisville area have declined to enter into such agreements.

The most salient aspect of Senate Bill 217, as codified in KRS 216B.0435, provides:

(1)     Each abortion facility shall enter into a written agreement with a licensed acute-care hospital capable of treating patients with unforeseen complications related to an abortion facility procedure by which agreement the hospital agrees to accept and treat these patients.

(2)     If unforeseen complications arise prior to or during an abortion facility procedure, the patient shall be transferred to the licensed acute-care hospital with which the abortion facility has a written agreement as provided under subsection (1) of this section or to the hospital selected by the patient, if the patient so chooses[.]

(3)     Each abortion facility shall enter into a written agreement with a licensed local ambulance service for the transport of any emergency patient within the scope of subsection (1) of this section to the licensed acute-care hospital[.]

(4)     The written agreements of an abortion facility with an acute-care hospital and with a local ambulance service shall be filed by the abortion facility with the cabinet[.]

Act of Apr. 14, 1998, ch. 582, § 5, 1998 Ky. Acts at 3508-09.  The law also imposes penalties for violations of the regulatory requirements imposed on abortion facilities.  *See* Act of Apr. 14, 1998, ch. 582, § 8, 1998 Ky. Acts at 3510.

No party disputes that the provisions of KRS 216B.0435 were in place for almost 19 years before the filing of this litigation.  In fact, by all accounts the necessity of the transfer and transport agreements appears to have been merely an item on the checklist of licensure

requirements, and the submitted agreements did not receive serious scrutiny.  As a result, KRS 216B.0435 does not appear to have impeded the availability of legal abortions in Kentucky until 2016.

### C.     Licensure Disputes

#### 1.     *EMW Plaintiffs*

Plaintiff Ernest Marshall, M.D. ("Dr. Marshall") is a board-certified obstetrician-gynecologist who has practiced for over forty years and has delivered thousands of babies during his career.  (Trial Tr. vol. 1B, 18:5-17, 23:1-6, DN 112).  He trains and teaches medical residents at the University of Louisville School of Medicine ("ULSM") and the University of Kentucky.  Dr. Marshall also maintains admitting privileges at Norton Hospital ("Norton").  (Trial Tr. vol. 1B, 19:12-20:8, 20:24-21:9, DN 112).   Plaintiff EMW Women's Surgical Center, P.S.C. ("EMW") employs two additional physicians—Dr. Ashlee Bergin and Dr. Tanya Franklin—both of whom are also professors at ULSM and maintain admitting privileges at University of Louisville Hospital ("U of L Hospital").  (Trial Tr. vol. 1B, 21:10-22:25, DN 112).

EMW is owned by Dr. Marshall and has been in operation in Louisville since the early 1980s.  (Trial Tr. vol. 1B, 18:1-2, 28:18, DN 112).  The facility is located less than a mile away from Norton, Jewish Hospital, and U of L Hospital.  (Trial Tr. vol. 1B, 27:15-19, DN 112).  EMW performs an average of 3,000 abortions per year and is the only licensed abortion clinic in Kentucky.  (Trial Tr. vol. 1B, 23:18-20, DN 112).

Until 2017, EMW had no difficulties in maintaining its license to perform abortions.  By letter dated April 27, 2016, the Kentucky Cabinet for Health and Family Services ("CHFS") notified EMW that its license was renewed from June 1, 2016, through May 31, 2017.  (Pls.' Trial Ex. EMW-PX037).  On March 13, 2017, however, CHFS advised EMW that its license had

been renewed in error and that EMW's transfer and transport agreements were not in compliance

with Kentucky law.  (Pls.' Trial Ex. EMW-PX027).  In particular, the letter stated:

> The tendered "Emergency Transfer Agreement", dated February 14, 2014, is deficient in that it (1) is not signed by an authorized representative of the University of Louisville Hospital (The acute-care hospital required to be named in the Agreement), (2) the University of Louisville Hospital withdrew from a similar arrangement with another abortion facility in 2016, and may have done so with the licensee, (3) the Chair, Department of Obstetrics, Gynecology and Women's Health is not authorized to enter into the Agreement and (4) the transfer agreement names the Emergency Room as the transferee.
>
> The tendered "Mercy Ambulance Service Inc." document, dated February 1, 2016, (encl. 2) does not mandate with reasonable certainty the transport of the licensee's patients to the Transfer Agreement named entity (University of Louisville Department of Obstetrics, Gynecology).  In fact, its terms are no more than an offer to provide a response time, upon being contacted, thus providing no certainty of transport for an emergency patient to the purported transfer hospital.

(Pls.' Trial Ex. EMW-PX027, at 1-2).  EMW was given ten days to cure the deficiencies under

threat that it would immediately lose its license to perform abortions.  (Pls.' Trial Ex. EMW-

PX027, at 2).  Despite its efforts, as outlined below, EMW was not able to obtain a transfer

agreement with any Louisville hospital and therefore filed this lawsuit seeking injunctive relief.

CHFS agreed not to take any further action on EMW's licensure status pending resolution of this

matter, but CHFS maintains in this action that EMW is not in compliance with Kentucky law.

(Order 1-2, DN 16; Defs.' Post-Trial Br. 7, DN 158).

## 2.   *Planned Parenthood*

Planned Parenthood is a non-profit healthcare provider which has been operating in

Louisville since 1933.  (Trial Tr. vol. 2B, 71:5-10, 72:1-13, 77:5-6, DN 116).  It currently

operates two Kentucky facilities, in Lexington and Louisville, offering a range of services

including cancer screening, pregnancy testing, reproductive health education, and provision of

contraception, as well as testing, treatment, and vaccinations for sexually transmitted diseases,

but excluding abortion services.  (Trial Tr. vol. 2B, 76:9-77:1, DN 116; Pls.' Trial Exs. PPINK-PX0243, PPINK-PX0244).  At its Louisville facility, Planned Parenthood served 3,173 patients in the 2016 fiscal year; 41% of its patients had annual incomes at or below 100% of the federal poverty level, and 58% at or below 150% of the federal poverty level.  (Trial Tr. vol. 2B, 75:13-24, DN 116; Intervenor-Pl.'s Trial Ex. PPINK-PX0244).

In 2009, Planned Parenthood decided to begin the process of obtaining licensure to provide abortion services at its Louisville location.[2]  (Trial Tr. vol. 2B, 77:7-17, DN 116).  Planned Parenthood began seeking a transfer agreement for its Louisville facility in mid-2013 by contacting Norton, which ultimately declined to enter into an agreement.  (Trial Tr. vol. 3A, 10:22-12:8, DN 126).  Planned Parenthood was then able to secure a transfer agreement in February 2014 with the Department of Obstetrics, Gynecology and Women's Health ("OB/GYN Department") of U of L Hospital.  (Trial Tr. vol. 3A, 13:2-14:15, DN 126; Intervenor-Pl.'s Trial Ex. PPINK-PX0003).  Planned Parenthood subsequently entered into a transport agreement with Louisville Metro Emergency Medical Services ("LMEMS") in October 2013.  (Trial Tr. vol. 3A, 14:17-24, DN 126; Intervenor-Pl.'s Trial Ex. PPINK-PX0002).

Believing it had satisfied the requirement of having both agreements in place, Planned Parenthood requested confirmation that its documentation was compliant with Kentucky law and was told by CHFS that its agreements were acceptable.  (Trial Tr. vol. 3A, 14:25-15:17, DN 126).  Planned Parenthood also continued its attempts to secure a transfer agreement with Norton, which led to the execution of a transfer agreement in May 2015.  (Trial Tr. vol. 3A, 15:18-16:23, DN 126; Intervenor-Pl.'s Trial Ex. PPINK-PX0166, at 3-9).  Later that year,

---

[2] As part of this process, Planned Parenthood made plans to relocate to a new facility in downtown Louisville and raised $3.87 million to construct the new building, which was completed in 2015.  (Trial Tr. vol. 2B, 79:7-81:5, DN 116).

6

however, talks with Norton to execute a new transfer agreement as part of Planned Parenthood's application for an abortion facility license broke down.  (Trial Tr. vol. 3A, 16:5-19:25, DN 126). During this time, Planned Parenthood likewise attempted to secure transfer agreements with other facilities, including Baptist Hospital, Jewish Hospital, and the Louisville VA Medical Center, but these efforts were also unsuccessful.  (Trial Tr. vol. 3A, 20:1-22:1, DN 126; Pls.' Trial Exs. PPINK-PX0157, PPINK-PX0183).

On November 19, 2015, Planned Parenthood filed an application with CHFS for an abortion facility, including its February 2014 transfer agreement with U of L Hospital and the transport agreement with LMEMS.  (Trial Tr. vol. 3A, 31:10-19, DN 126; Intervenor-Pl.'s Trial Ex. PPINK-PX0001).   Following its application, Planned Parenthood sought and received confirmation from Kentucky's then-Inspector General Maryellen Mynear ("Mynear")[3] that "a facility must be performing services for which it seeks licensure so that the survey (i.e., inspection) process may fully evaluate compliance with the applicable regulations."  (Trial Tr. vol. 2B, 74:10-19, 82:6-15, DN 116; Intervenor-Pl.'s Trial Ex. PPINK-PX0213).   Planned Parenthood began providing abortion services in anticipation of the forthcoming CHFS inspection and performed 23 abortions in December 2015 and January 2016.  (Trial Tr. vol. 2B, 74:10-19, 82:6-15, DN 116).  In early 2016, CHFS informed Planned Parenthood of concerns it had about the terminology used in its transfer and transport agreements, and the parties subsequently signed new agreements incorporating the state's preferred language.  (Trial Tr. vol. 3A, 22:2-23:8, 31:10-32:3, DN 126; Intervenor-Pl.'s Trial Exs. PPINK-PX0006, PPINK-PX0007).  CHFS later requested additional documentation from Planned Parenthood, which was

---

[3] The Inspector General is the head of the Office of Inspector General ("OIG") in CHFS, who is appointed by the Secretary of CHFS with the approval of the Governor.  *See* KRS 194A.030(1)(c).  The OIG is responsible for licensing and regulatory functions as designated by the Secretary, among other duties.  *See* KRS 194A.030(1)(c)(1)-(4).

provided.  (Trial Tr. vol. 3A, 32:4-33:20, DN 126; Intervenor-Pl.'s Trial Exs. PPINK-PX0008, PPINK-PX0013).

Shortly after a new transfer agreement was signed by U of L Hospital, representatives of KentuckyOne Health ("KentuckyOne")—a hospital management company controlled by Catholic Health Initiatives which had taken over operation of U of L Hospital—advised Planned Parenthood that U of L Hospital was terminating the agreement.  The termination was apparently due to concerns regarding the hospital's state funding, public controversy,[4] as well as the determination by KentuckyOne that the transfer agreement was unnecessary, from the hospital's perspective, to ensure proper medical treatment for any patients presenting for care at the U of L Hospital emergency room.  (Trial Tr. vol. 2B, 82:25-86:7, DN 116; Trial Tr. vol. 3A, 23:10-26:19, 60:11-64:5, 71:12-78:18, DN 126; Intervenor-Pl.'s Trial Exs. PPINK-PX0151, PPINK-PX0201, PPINK-PX0240).[5]

Ultimately, Planned Parenthood executed transfer agreements with University of Kentucky Hospital ("UK Hospital"), located 70 miles away in Lexington, and Clark Memorial Hospital, which is located across the Ohio River from Louisville four miles away in Jeffersonville, Indiana, and transmitted those agreements to CHFS.  (Trial Tr. vol. 3A, 27:12-28:17, 33:21-34:3, DN 126; Intervenor-Pl.'s Trial Exs. PPINK-PX0010, PPINK-PX0011,

---

[4] Planned Parenthood has argued that the agreement was terminated when KentuckyOne "consult[ed] with the Archdiocese of Louisville and learn[ed] that its agreement with Planned Parenthood might be deemed 'material support' for an abortion provider, or risk the possibility of 'scandal,' in contravention of the Ethical and Religious Directives of the U.S. Conference of Catholic Bishops," even though the oversight of the OB/GYN Department was excluded from KentuckyOne's responsibilities. (Intervenor-Pl.'s Proposed Findings Fact & Conclusions Law 9-10, DN 157 (citing Intervenor-Pl.'s Trial Exs. PPINK-PX0201, PPINK-PX0202, PPINK-PX0208; Reynolds Dep. 13:23-14:25, 22:7-23:5, 36:10-37:14, 40:1-41:18, Aug. 15, 2017, DN 135-1); Trial Tr. 3A, 56:16-57:10, DN 126)).

[5] When KentuckyOne was replaced in the U of L Hospital system, Planned Parenthood again attempted to secure a transfer agreement, to no avail. (Trial Tr. vol. 3A, 28:9-30:5, DN 126; Intervenor-Pl.'s Trial Ex. PPINK-PX0242).

PPINK-PX0012).  CHFS rejected these agreements, citing the distance between the proposed facility and UK Hospital, and the fact that Clark Memorial Hospital was not a Kentucky-licensed hospital.  (Trial Tr. vol. 3A, 34:4-17, DN 126; Intervenor-Pl.'s Trial Ex. PPINK-PX0014).  Prior to its rejection of Planned Parenthood's agreements in 2016, CHFS had never found any transfer or transport agreements deficient.  (Trial Tr. vol. 2B, 10:22-12:22, 45:24-48:11 DN 116; Trial Tr. vol. 3B, 60:9-19, DN 128).  Planned Parenthood's appeal of CHFS's decision was unsuccessful. (Trial Tr. vol. 3A, 34:18-23, DN 126).

###   D.   Executive Action

EMW Plaintiffs and Planned Parenthood invite the Court to delve in to the involvement of Kentucky Governor Matthew Bevin ("Governor Bevin"), at least through his senior staff including General Counsel Stephen Pitt ("Pitt"), in what would ordinarily be department-level review of abortion clinic licensure issues.  Although this contention seems generally supported by the record, the actions or intent of Governor Bevin and his cadre have little bearing on the outcome of this case.  Suffice it to say that the perceived influence of the Governor's Office has essentially eliminated the availability of transfer agreements between EMW and Planned Parenthood and any Louisville hospital.[6]  U of L Hospital terminated its transfer agreement with Planned Parenthood after a meeting between its lobbyist and Pitt.  (Trial Tr. vol. 2B, 115:23-124:25, DN 116; Trial Tr. vol. 3A, 77:23-78:2, DN 126; Intervenor-Pl.'s Trial Exs. PPINK-PX0203, PPINK-PX0240).  Further, immediately following U of L Hospital's cancellation of the transfer agreement with Planned Parenthood, KentuckyOne's CEO and its legislative affairs vice

---

[6] For instance, Governor Bevin's proposed budget for 2016 contained a provision excluding state funding for any "affiliate" of abortion facilities, which caused KentuckyOne to believe that its state funding would be jeopardized by a transfer agreement between U of L Hospital and any abortion clinic.  (Intervenor-Pl.'s Trial Ex. PPINK-PX00209, at 88; Trial Tr. vol. 2B, 84:11-20, 116:11-118:7, 120:12-121:5, DN 116).

president drove to Frankfort to tell Pitt in person because they considered him a "stakeholder" in the decision.  (Trial Tr. vol. 2B, 126:2-11, DN 116; Trial Tr. vol. 3A, 62:5-63:10, 78:19-79:12, DN 126).  Norton likewise approached the Bevin administration to advise that it had not and would not be entering into transfer agreements with any abortion clinics.  (Bilby Dep. 31:7-17, Sept. 1, 2017, DN 138-1).

Regardless of the reasons, it is clear that despite EMW and Planned Parenthood's best efforts, no Louisville hospital is currently willing to sign a transfer agreement with this type of facility.  As a result, it is impossible for EMW Plaintiffs or Planned Parenthood to comply with the requirement of such agreements under KRS 216B.0435 and 902 KAR 20:360 Section 10.

### E.    Regulations Enacted under KRS 216B.0435

In 1999, CHFS promulgated 902 KAR 20:360, implementing KRS 216B.0435 and establishing licensure requirements applicable to abortion facilities.  Prior to the initiation of this litigation, the relevant portion of the regulation provided in its entirety:  "(1) An abortion facility shall enter into written agreements with a licensed acute-care hospital and a local ambulance service for the transport and treatment of patients when hospitalization becomes necessary, as required by KRS 216B.0435.  (2) These written agreements shall be filed with the cabinet."  902 KAR 20:360, § 10.   Thus, the pre-2017 version of the regulation placed no meaningful requirements on the agreements between abortion facilities and hospitals and ambulance services beyond the dictates of the statute.  (Trial Tr. vol. 2A, 15:6-16:9, DN 115; Trial Tr. vol. 3A, 12:2-8, 20:1-24:20, 62:5-64:2, DN 126).

Following the initiation of this litigation, however, on June 15, 2017, Kentucky promulgated an emergency administrative regulation amending the relevant portion of 902 KAR

20:360.[7]   According to Inspector General Robert Silverthorn, Jr. ("Silverthorn"),[8] he became concerned about the lack of standards applicable to transfer and transport agreements articulated in the prior version of the regulation, which he believed constituted a public health emergency. (Trial Tr. vol. 2A, 26:24-30:11, 31:21-36:8, 75:16-76:8, DN 115).   At trial, Silverthorn testified that he could not accept a transfer agreement with a non-Kentucky acute care hospital because the OIG has no authority to regulate acute care hospitals in other states.   (Trial Tr. vol. 2A, 35:1-22, DN 115).   While Silverthorn was concerned about the absence of standards articulated in the existing regulation and initiated the process of promulgating the emergency regulation to address his concerns, he conceded that no physicians were consulted regarding the substance of the emergency regulation.   (Trial Tr. vol. 2A, 29:25-30:11, DN 115).

> As part of the justification for the emergency administrative regulation, CHFS stated:
>
> This emergency action is necessary to establish standards for effective transfer and transport agreements that serve to minimize risks associated with an emergent situation through the use of carefully designed protocols focused on maximizing the efficiency of the patient's transfer.   This action must be implemented on an emergency basis in accordance with KRS 13A.190(1)(a) to avoid an imminent threat to public health and safety.

Statement of Emergency, 902 KAR 20:360E.   In particular, the emergency regulation amended Section 10, *inter alia*, to provide:   (i) the transfer agreement must be with a Kentucky-licensed acute care hospital within the same county as the abortion facility or within a twenty-minute drive; (ii) the transport agreement must be with a Kentucky-licensed ambulance service in the same county as the abortion facility, or within five miles or ten minutes from the abortion facility; (iii) the ambulance service must acknowledge the existence of and familiarity with the

---

[7] While EMW Plaintiffs and Planned Parenthood question whether an emergency existed to trigger rulemaking pursuant to KRS 13A.190, they have not asserted a claim challenging the validity of the emergency administrative regulation on that basis.

[8] After the trial of this matter, Silverthorn resigned from his position on September 28, 2017.

transfer agreement and agree to transfer the patient to the transferee hospital absent a different request from the patient; and (iv) existing abortion facilities seeking license renewals and new applicants for abortion facilities were allowed to submit written requests for extensions of time of up to ninety days to comply with the requirement of obtaining transfer and transport agreements.[9]  *See* 902 KAR 20:360E, § 10(1), (3), (4), (5).  As noted at trial, the ninety-day provisional licensure or extensions of time for abortion facilities without compliant transfer and/or transport agreements was intended to allow them to continue to operate while seeking such agreements.  (Trial Tr. vol. 2A, 30:14-31:14, DN 115; Pls.' Trial Ex. EMW-PX0175; Intervenor-Pl.'s Trial Ex. PPINK-PX0029).

### F.     Procedural History

On March 29, 2017, EMW and Dr. Marshall (collectively "EMW Plaintiffs") filed this action against Defendant Vickie Yates Brown Glisson ("Glisson") in her official capacity as Secretary of the CHFS, alleging violations of the First and Fourteenth Amendments of the U.S. Constitution.  (Pls.' Verified Compl. ¶¶ 56-63, DN 1).  EMW Plaintiffs also requested injunctive relief from enforcement of the unconstitutional regulation of abortion facilities.  (Pls.' Verified Compl. 15).  On March 31, 2017, this Court entered a temporary restraining order pursuant to Fed. R. Civ. P. 65 enjoining the enforcement of KRS 216B.0435 and 902 KAR 20:360 Section 10.  (TRO 3-4, DN 6).  By agreement of the parties, the Court later entered a preliminary injunction pending the entry of a final judgment in this action.  (Order 1, DN 16).

On June 23, 2017, the Court permitted Planned Parenthood to intervene in this action. (Mem. Op. & Order 13, DN 45; Intervenor-Pl.'s Compl., DN 46).  In its Complaint, Planned

---

[9] Through the rulemaking process, the emergency regulation essentially became the current version of 902 KAR 3:360 with minor revisions effective October 11, 2017, and is still currently in effect.

Parenthood asserted claims for, *inter alia*, violations of the Fourteenth Amendment of the U.S. Constitution.  (Intervenor-Pl.'s Compl. ¶¶ 55-77).  Planned Parenthood also asserted claims against Governor Bevin in his official capacity.  (Intervenor-Pl.'s Compl. ¶ 13).

The parties subsequently engaged in pretrial discovery.  In addition to the production of documents, the parties deposed various persons and have filed numerous deposition transcripts with the Court.  Following a three-day bench trial, the parties submitted post-trial briefs and proposed findings of fact and conclusions of law.  (Pls.' Proposed Findings Fact & Conclusions Law, DN 154; Defs.' Proposed Findings Fact & Conclusions Law, DN 156; Intervenor-Pl.'s Proposed Findings Fact & Conclusions Law, DN 157; Defs.' Post-Trial Br., DN 158).

### G.   Contentions of the Parties

#### 1.   *EMW Plaintiffs*

EMW Plaintiffs assert that they have standing to assert claims on behalf of themselves, their staffs, and their patients.  (Pls.' Verified Compl. ¶ 1).  They request that the Court declare the challenged regulations unconstitutional both as-applied and facially.  (Pls.' Verified Compl. ¶ 15).  EMW Plaintiffs argue that the Court should declare the challenged laws unconstitutional as violating the Fourteenth Amendment of the U.S. Constitution because the laws violate their substantive due process rights.  (Pls.' Verified Compl. ¶¶ 56-57).  In particular, EMW Plaintiffs maintain that the challenged laws impose an undue burden on women's rights to an abortion because the effect of these laws is to eliminate legal abortions in Kentucky.  (Pls.' Verified Compl. ¶ 54).

EMW Plaintiffs also contend that these challenged laws constitute an unlawful delegation of licensing authority in violation of the Fourteenth Amendment.  (Pls.' Verified Compl. ¶¶ 60-61).  Allowing acute care facilities to determine whether to enter into transfer agreements, EMW

contends, effectively empowers those facilities to determine whether abortion facilities are able to be licensed.  (Pls.' Verified Compl. ¶ 61).

### 2.     *Planned Parenthood*

Planned Parenthood argues that it has standing to represent its patients' Fourteenth Amendment interests.  (Intervenor-Pl.'s Proposed Findings Fact & Conclusions Law 52-53). Planned Parenthood's first contention is that the challenged statute and implementing regulation violate the Fourteenth Amendment by having the purpose and effect of placing a substantial obstacle in the path of a woman seeking an abortion.  (Intervenor-Pl.'s Proposed Findings Fact & Conclusions Law 53-76).  It avers that Defendants have not met their burden of proving that the challenged legislation furthers a legitimate state interest in protecting women's health and that any supposed benefit is vastly outweighed by the burdens placed on women seeking an abortion. (Intervenor-Pl.'s Proposed Findings Fact & Conclusions Law 54-56, 61-70).

Planned Parenthood next contends that the transfer and transport agreement requirements create an unlawful delegation of abortion facility licensure decisions to private hospitals and ambulance services, in violation of its due process rights.  (Intervenor-Pl.'s Proposed Findings Fact & Conclusions Law 76-79).   It further claims that the challenged legislation and Defendants' enforcement thereof violate the Equal Protection clause, whether examined under strict scrutiny or rational basis review.  (Intervenor-Pl.'s Proposed Findings Fact & Conclusions Law 79-84).

### 3.     *Defendants*

Defendants respond that KRS 216B.0435 and 902 KAR 20:360 Section 10 do not place a substantial burden on a woman's right to obtain an abortion in Kentucky.  (Defs.' Post-Trial Br. 18-20).  They maintain that the challenged laws serve a valid purpose by ensuring that women

experiencing complications from abortion procedures are properly transferred to acute care hospitals and receive proper care when they arrive in the emergency room.  (Defs.' Post-Trial Br. 21-28).  Defendants also posit that the mandated transport agreements are necessary to facilitate the transportation of women by ambulance to an acute care hospital in the event of an emergency.  (Defs.' Post-Trial Br. 21-28).  Thus, Defendants reason that the challenged laws serve a valid state purpose and have a rational basis.  (Defs.' Post-Trial Br. 17-18).

## II.   FACTUAL ISSUES

As framed by the parties, the bench trial addressed the following primary issues of fact:

(i)      whether KRS 216B.0435 and 902 KAR 20:360 Section 10 serve a medical purpose and are medically necessary and reasonable;

(ii)     how the enforcement of KRS 216B.0435 and 902 KAR 20:360 Section 10 will affect abortion facilities performing abortions in Kentucky; and

(iii)    how the enforcement of KRS 216B.0435 and 902 KAR 20:360 Section 10 will affect the ability of women in Kentucky to obtain an abortion.

## III.   FINDINGS OF FACT

"In an action tried on the facts without a jury . . . , the court must find the facts specifically and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  The Court's findings of fact based on the evidence submitted in the record and the trial testimony are set forth below.[10]  *See Gold v. United States*, 552 F. Supp. 66, 67 (D. Colo. 1982) (citations omitted).  The Court has considered the evidence submitted by the parties, has observed the demeanor and credibility of the witnesses who testified in court, and has carefully weighed the evidence in determining the facts pertinent to the case and drawing conclusions therefrom.

---

[10] In addition, the stipulated facts tendered by Planned Parenthood, Glisson, and Governor Bevin (DN 105) are generally incorporated by reference but also cited throughout.

A.   **Abortion Generally & in Kentucky**

According to a recent study discussed in the *American Journal of Public Health*, the number of abortions performed in the United States is on the decline.  *See* Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidences of Abortion:  United States, 2008-2014*, 107 Am. J. Pub. Health 1904, 1904 (2017).  "In 2014, 926[,]190 abortions were performed in the United States; the abortion rate was 14.6 abortions per 1000 women aged 15 to 44 years, meaning that in that year 1.5% of women of reproductive age had an abortion." *Id.*  Of the women seeking abortions that year, "49% . . . had family incomes below 100% of the federal poverty level, a significant increase from 42% in 2008.  . . . Low-income and younger women have traditionally been at increased risk for unintended pregnancy and, in turn, abortion."[11]  *Id.*; *see also June Med. Servs. LLC v. Kliebert*, 158 F. Supp. 3d 473, 487 (MD. La. 2016) ("Nationally, approximately 42% of women who have abortions fall below the federal poverty level, and another 27% fall below 200% of that level."  (citations omitted)); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 981-82 (W.D. Wis. 2015) (noting the decline in the number of abortions).

---

[11] A more recent study published by the National Academies of Sciences, Engineering, and Medicine similarly noted:

> Most women who have abortions are under age 30 (72 percent), are unmarried (86 percent), and are poor or low-income (75 percent).  Women who have abortions are also more likely to be women of color (61.0 percent); half of all women who have abortions are black (24.8 percent) or Hispanic (24.5 percent).  This distribution is similar to the racial and ethnic distribution of women with household incomes below 200 percent of the federal poverty level (FPL).  Poor women and women of color are also more likely than others to experience an unintended pregnancy.

Nat'l Acads. of Scis., Eng'g & Med., The Safety and Quality of Abortion Care in the United States S-6 (2018) [hereinafter NAS Study]).

During the period of time relevant to this lawsuit, a woman in Kentucky could legally obtain an abortion prior to twenty weeks post-fertilization.  *See* KRS 311.782(2)(a).  After twenty weeks, a woman could only obtain an abortion if her life was endangered or if her physical health was severely compromised.  *See* KRS 311.782(2)(b).  Because Kentucky permitted later-term abortions compared to other states and EMW is able to handle complicated situations arising from later-term abortions, residents of the neighboring states of Indiana, Ohio, Tennessee, and West Virginia have traveled to EMW to have an abortion.  (Trial Tr. vol. 1B, 26:17-27:1, DN 112).

Following the U.S. Supreme Court's decision in *Roe v. Wade* legalizing abortion in 1973, there were seventeen clinics and hospitals performing abortions in Kentucky in the 1970s.  *See Roe v. Wade*, 410 U.S. 113, 154 (1973); Chris Kenning, "Kentucky's Last Abortion Clinic in Long-Running War," Courier J. (Louisville, Ky.) (Feb. 23, 2017), https://www.courier-journal.com/story/news/local/2017/02/23/abortion-restrictions-raise-stakes-long-running-sidewalk-showdown/97707454/ (last visited Sept. 26, 2018).  Today, there is only one licensed operating abortion facility in Kentucky—EMW—and another facility operated by Planned Parenthood has been unsuccessful in its application for licensure to perform abortions.  (Trial Tr. vol. 2A, 55:21-24, DN 115).

B.    **Purpose and Medical Reasonableness of KRS 216B.0435 and 902 KAR 20:360 Section 10**

Through various filings and proof presented at trial, the parties have introduced evidence regarding the purpose and medical reasonableness of the challenged Kentucky regulations.  Much of this evidence was submitted via expert and factual testimony.  The Court will therefore consider each expert's credibility and make factual findings concerning the risks associated with abortions and whether transfer and transport agreements mitigate those risks.

17

1. ***Experts' Qualifications***

    a. **EMW Plaintiffs' and Planned Parenthood's Expert**

The Court was impressed with the credibility of the retained expert, Dr. Paula J.A. Hillard ("Dr. Hillard"). Dr. Hillard is a professor of Obstetrics and Gynecology at Stanford University Medical Center. (Trial Tr. vol. 1A, 52:23-53:1, DN 108; Pls.' Notice Expert Test. Ex. A, at 2, DN 32-1). She has served as the Associate Chair of Medical Student Education in the Department of Obstetrics and Gynecology at Stanford since 2011, and from 2007 to 2011 she served as Chief of the Division of Gynecologic Specialties for that department. (Pls.' Notice Expert Test. Ex. A, at 2). Previously, Dr. Hillard practiced medicine for twenty-three years as a member of the faculty of the University of Cincinnati College of Medicine. (Trial Tr. vol. 1A, 53:17-21, DN 108; Pls.' Notice Expert Test. Ex. A, at 2). She also served three years on the faculty at the University of Virginia School of Medicine. (Trial Tr. vol. 1A, 54:20-21, DN 108; Pls.' Notice Expert Test. Ex. A, at 2).

Dr. Hillard earned her medical degree from Stanford University and completed her residency training at the University of North Carolina. (Trial Tr. vol. 1A, 53:24-54:2, DN 108). Dr. Hillard became board certified in obstetrics and gynecology in 1983 and is a fellow of the American College of Obstetricians and Gynecologists, and the American Gynecological and Obstetrical Society. (Trial Tr. vol. 1A, 53:9-16, 55:3-7, DN 108; Pls.' Notice Expert Test. Ex. A, at 2).

Beyond that, Dr. Hillard serves as the editor-in-chief of the *Journal of Pediatric and Adolescent Gynecology* and has served as an editorial board member and reviewer/consultant for numerous journals. (Pls.' Notice Expert Test. Ex. A, at 2). She has authored or co-authored more than 140 articles on obstetrics and gynecology in peer-reviewed journals, and more than 40

book chapters.  (Trial Tr. vol. 1A, 54:3-12, DN 108; Pls.' Notice Expert Test. Ex. A, at 2).  She has served as the sole editor for two books.  (Trial Tr. vol. 1A, 54:12, DN 108; Pls.' Notice Expert Test. Ex. A, at 2).

Dr. Hillard also has clinical experience relevant to the issues in this case.  She has performed abortions, teaches medical students how to perform abortions, and has given presentations on abortion to other physicians.  (Trial Tr. vol. 1A, 54:23-55:2, DN 108; Pls.' Notice Expert Test. Ex. A, at 3).  The Court accepts Dr. Hillard as an expert in obstetrics and abortion care.

In addition to Dr. Hillard, EMW Plaintiffs and Planned Parenthood presented several witnesses who provided factual and expert opinion testimony, including Dr. Christine Cook ("Dr. Cook").[12]  (Pls.' Notice Expert Test. Ex. B, at 2-4, DN 32-2).  Dr. Cook supervises residents at the University of Louisville as they learn about and practice obstetrics and gynecology.  (Trial Tr. vol. 1A, 100:20-23, DN 108).  Prior to that, she worked in various roles at the University of Louisville.  (Trial Tr. vol. 1A, 100:20-13, DN 108).  From 2004 to 2011, Dr. Cook served as the chair of the OB/GYN Department.  (Trial Tr. vol. 1A, 101:1-3, DN 108).  She is board certified in obstetrics and gynecology and has published more than thirty articles related to that field.  (Trial Tr. vol. 1A, 101:4-12, DN 108).  Finally, Dr. Cook is trained to provide abortions, has performed abortions, and has cared for and treated women who have attempted to terminate their pregnancies on their own or without the assistance of an abortion facility.  (Trial Tr. vol. 1A, 102:2-5, 115:14-16, DN 108).  To the extent Dr. Cook provided expert opinions, the Court accepts her as an expert in obstetrics and abortion care.

---

[12] Dr. Marshall also provided factual and expert testimony on behalf of EMW Plaintiffs.  The Court, however, has already discussed his pertinent credentials.  Based on those credentials, the Court accepts Dr. Marshall as an expert in obstetrics and abortion care.

### b.      Defendants' Expert

At trial, Defendants proffered the expert testimony of Dr. Richard Hamilton, who currently is a Professor and Chair of Emergency Medicine at Drexel University College of Medicine.  (Trial Tr. vol. 3A, 88:25-89:1, DN 126; Defs.' Notice Filing Rebuttal Expert Reports Ex. B, at 12, DN 44-2).  Dr. Hamilton earned his medical degree from Hahnemann University (now Drexel University College of Medicine) and his undergraduate degree from the University of Pennsylvania, which are both located in Philadelphia, Pennsylvania.  (Trial Tr. vol. 3A, 88:5-6, DN 126; Defs.' Notice Filing Rebuttal Expert Reports Ex. B, at 14).  Since 1997, Dr. Hamilton has been engaged in an academic practice of emergency medicine and medical toxicology, and previously completed his residency in emergency medicine and a fellowship in medical toxicology.  (Trial Tr. vol. 3A, 88:11-14, DN 126; Defs.' Notice Filing Rebuttal Expert Reports Ex. B, at 2).  He is board certified in both emergency medicine and medical toxicology. (Trial Tr. vol. 3A, 89:2-4, DN 126; Defs.' Notice Filing Rebuttal Expert Reports Ex. B, at 14). Dr. Hamilton retired from United States Navy at the rank of Captain and served as a naval flight surgeon.  (Trial Tr. vol. 3A, 88:7-10, DN 126; Defs.' Notice Filing Rebuttal Expert Reports Ex. B, at 2).  Prior to that, he served as Chief of Medical Operations and Chief of Service at the Naval Air Development Center.  (Defs.' Notice Filing Rebuttal Expert Reports Ex. B, at 2-3). Dr. Hamilton was retained as an expert witness in this matter to provide opinions as an emergency medicine physician.  (Defs.' Notice Filing Rebuttal Expert Reports Ex. B, at 3).

Dr. Hamilton testified that he had not reviewed KRS 216B.0435 or 902 KAR 20:360 Section 10.  (Trial Tr. vol. 3A, 110:21-111:2, DN 126).  He has never performed an abortion and was not aware of any case in which a woman obtaining an abortion in Kentucky received improper care.   (Trial  Tr.  vol.  3A,  111:9-14,  111:21-25,  112:1-3,  DN  126).   He also

acknowledged that he was not proffering any opinions about transport agreements. (Trial Tr. vol. 3A, 112:4-6, DN 126). Dr. Hamilton further conceded he did not review the transfer agreements that either EMW or Planned Parenthood had for its facility, so he could not offer any opinions as to the sufficiency of those agreements. (Trial Tr. vol. 3A, 113:16-114:2, DN 126). He was unfamiliar with the protocols at abortion facilities to ensure patient safety. (Trial Tr. vol. 3A, 120:19-121:2, DN 126). In more general terms, Dr. Hamilton had not reviewed and was unaware of any study showing an impact on patient care resulting from a transfer agreement. (Trial Tr. vol. 3A, 118:23-119:3, DN 126; Trial Tr. vol. 3B, 12:15-18, DN 128).

While Dr. Hamilton has practiced emergency medicine, his opinions have no bearing on the frequency of complications arising in an abortion-facility setting. (*See, e.g.*, Trial Tr. vol. 3A, 111:5-25, DN 126). In fact, in the past five years, he has only treated one patient suffering from abortion-related complications in an emergency setting. (Trial Tr. vol. 3A, 111:22-25, DN 126). Further, though he was able to offer some insight into the mechanics of patient transfer, Dr. Hamilton lacked sufficient knowledge to offer opinions regarding the practical necessity and benefits of transfer agreements. At best, Dr. Hamilton indicated that transfer agreements would theoretically help achieve optimal patient care in the abstract, but failed to provide meaningful detail as to how the utilization of such agreements improved care in any tangible way. (*See, e.g.*, Trial Tr. vol. 3A, 90:21-22, DN 126). That said, the Court will accept Dr. Hamilton as an expert in the field of emergency medicine, but not as an expert in the field of obstetrics or abortion care.

### 2.   *Impacts of Transfer and Transport Agreements*

The Court will now address the nature of the risks associated with abortions and whether transfer or transport agreements mitigate those risks.

### a.     Abortion Risks

As an initial matter, the Court finds that abortion is a relatively safe medical procedure. The risk of death from abortion procedures is less than that posed by childbirth.  (Trial Tr. vol. 1A, 75:16-19, DN 108).  As cited by Plaintiffs, a study analyzing 54,911 abortions performed in California during 2009 and 2010 found that only about "1 [out] of [every] 5,491 (0.03 percent, n=15) [abortion procedures] involved ambulance transfers to emergency departments on the day of the abortion."[13]  Ushma D. Upadhyay, et. al, *Incidence of Emergency Department Visits and Complications After Abortion* 2015 [hereinafter Upadhyay Study] (admitted as Plaintiffs' Trial Exhibit EMW-PX119).

Though abortions are generally safe, each of the four types abortion procedures pose some risk of complication.  Because the facilities at issue in this case only performed "medication" (also referred to as "medical") and "aspiration" (also referred to as "surgical") abortions, the Court will limit its factual findings to the risks associated with those procedures. (Stipulations Parties ¶ 17, DN 43).

### i.     Medication Abortion

One common form of abortion is medication abortion, which involves the use of medications such as mifepristone and misoprostol that break down the implanted embryo and essentially cause pregnant women to experience a spontaneous abortion or miscarriage.  (Trial Tr. vol. 1A, 57:5-9, DN 108).  Though medication abortions are safe, the procedure does present

---

[13] Both Dr. Hillard's trial testimony and the Upadhyay Study are consistent with the NAS Study, which noted that the risk of mortality relating to abortions in the United States is extremely low—particularly when compared to other procedures.  According to the NAS Study, the mortality rate based on the number of deaths per 100,000 procedures was 0.7 for legal abortions (1988-2010), 8.8 for childbirth (1988-2005), 2.9 for colonoscopies (2001-2015), 0.0 to 1.7 for dental procedures (1999-2005), and 0.8 to 1.7 for plastic surgery (2000-2012).  *See* NAS Study 2-24.

some risk of complications, including excessive bleeding or infection, that typically arise after the patient has returned home.   (Trial Tr. vol. 1A, 57:24-58:19, DN 108).   Dr. Hillard's testimony is consistent with the Upadhyay Study, which noted the complication rates for medication abortions as follows:   incomplete abortions (0.87%); failed abortions (0.13%); hemorrhaging (0.14%); and infection (0.23%).[14]   *See* Upadhyay Study 180.   Further, as Dr. Hillard testified, these complications generally manifest in a nonclinical setting—i.e., after the patient has left the facility where the medication was administered.   (Trial Tr. vol. 1A, 57:24-58:19, DN 108).

Based on the evidence presented at trial and the Upadhyay Study, the Court finds that medication abortions involve minimal health risks to women.   Of equal significance, the Court finds that complications arising from medication abortions typically present after a woman has returned home from the abortion facility.

---

[14] Similarly, the NAS Study notes:

> It is common for medical procedures to result in side effects in addition to the intended outcome.   Medication abortions involve cramping, pain, and bleeding, similar to the symptoms of a miscarriage.   Vaginal bleeding is expected during and after an abortion and occurs in almost all patients during a medication abortion.

NAS Study 2-8 (internal citation omitted) (citation omitted).   The NAS Study further explains that the FDA has approved mifepristone for use in medical abortions for nearly twenty years, during which time "an extensive body of research has led to improvements in the drug's protocol"—including minimization of the drug's side effects.   NAS Study 2-6.   As a result, "[c]omplications after medical abortion, such as hemorrhage, hospitalization, persistent pain, infection, or prolonged heavy bleeding, are rare—occurring in no more than a fraction of a percent of patients."   NAS Study 2-9 (citations omitted).

### ii.  Aspiration Abortion Risks

The most widely used abortion method in the United States is called an aspiration or surgical abortion, which can occur during the first or second trimester of pregnancy.  (Trial Tr. vol. 1A, 57:10-20, DN 108).  As described at trial:

> [An aspiration abortion] involves an examination as a woman might have for obtaining a pap smear.  And in that procedure then the cervix, the opening of the uterus, is dilated or stretched and a suction cannula, like a straw, is introduced into the uterine cavity and the pregnancy is evacuated in that manner.  So that is typically what happens with a first trimester abortion procedure.  With a second trimester abortion procedure, it is a combination of vacuum extraction, plus extraction of the fetus with instruments.

(Trial Tr. vol. 1A, 57:12-20, DN 108).

Like medication abortions, there are potential side effects associated with aspiration abortions.  These complications can include excessive bleeding or infection, but also uterine perforation, which can be more serious.  (Trial Tr. vol. 1A, 58:20-60:22, DN 108).  According to the Upadhyay Study, the complication diagnoses for first-trimester aspiration abortions were as follows:  incomplete abortions (0.33%); failed abortions (0.04%); hemorrhaging (0.13%); and infection (0.27%).[15]  *See* Upadhyay Study 180.

Thus, as with medication abortions, the Court finds that aspiration abortions involve minimal risk to women.  The Court further finds based on Dr. Hillard's testimony that the complications that can arise from such abortions also usually occur in a nonclinical setting.  (Trial Tr. vol. 1A, 59:11-60:15, DN 108).  If the complications were to present while the patient is still at the abortion facility, "[t]he complications typically can be managed in an outpatient

---

[15] Similarly, the NAS Study notes that "[a]spiration abortions rarely result in complications.  In a recent retrospective analysis of California fee-for-service (FFS) Medicaid claims data, 57 of almost 35,000 women (0.16 percent) were found to have experienced a serious complication (hospital admission, surgery, or blood transfusion) after an aspiration abortion."  NAS Study 2-13 (internal citations omitted).

facility, a physician's office or a clinic, depending on the type of complication, but serious complications that would require transfer are really quite rare."  (Trial Tr. vol. 1A, 61:4-7, DN 108).

### b.      Impact of Transfer and Transport Agreements on Safety of Abortions

Having determined that medication and aspiration abortions pose minimal risks to a patient's safety, the Court must now determine whether (or the extent to which) transfer or transport agreements mitigate those risks.  Overall, the Court finds that neither type of agreement improves the safety of abortion procedures in Kentucky.

### i.      Transfer and Transport Agreements Provide No Significant Benefit

EMW Plaintiffs and Planned Parenthood presented substantial evidence demonstrating that transfer and transport agreements are medically unnecessary because abortion patients are unlikely to experience abortion-related complications.  As discussed previously, Dr. Hillard testified that complications can usually be managed at the abortion facility or doctor's office and only rarely result in a transfer—in as few as 0.03% of the cases.  (Trial Tr. vol. 1A, 61:4-7, 62:3-4, DN 108 (quoting Upadhyay Study 175)).  Thus, transfer and transport agreements are minimally applicable because they purport to address situations that arise only very rarely.

EMW Plaintiffs and Planned Parenthood further submitted evidence showing that the required agreements are unnecessary because they are unlikely to benefit a woman suffering from an abortion-related complication.  For instance, Dr. Hillard explained that in the rare circumstances in which a patient suffers abortion-related complications, the complications usually arise after the patient has returned home, rendering meaningless any transfer or transport agreement between the abortion clinic and another entity.  (*See* Trial Tr. vol. 1A, 57:24-58:19,

DN 108).  Dr. Hamilton—Defendants' expert—failed to rebut that testimony.  In fact, he essentially conceded that transfer agreements are unnecessary in the real-world because abortion complications typically first present after the patient has returned home.  (Trial Tr. vol. 3B, 15:4-19, DN 128).

To further demonstrate the inefficacy of the challenged regulations, Dr. Hamilton testified that, in the context of providing emergency care to a transferring patient, a facility's emergency transfer *protocols* are more important than the existence of an interfacility transfer *agreement*.  (Trial Tr. vol. 3B, 9:17-24, DN 128).  He explained that facilities generally refer to their transfer protocols—i.e., internal guidelines—rather than transfer agreements when transferring a patient and that, even without a transfer agreement, a transferring facility can define its protocols to correspond with a receiving facility's protocols, thereby enhancing a patient's care.  (Trial Tr. vol. 3B, 10:19-11:12, DN 128).

Planned Parenthood's Vice President of Patient Services, Lynne Bunch ("Bunch"), corroborated the testimony of both Drs. Cook and Marshall that transfer agreements have no impact on the care patients receive in the emergency room, are not regularly consulted when patients are received, and are not necessary to protect the health of a patient.  (Trial Tr. vol. 3B, 29:3-13, 31:2-10, DN 128).  Bunch noted that local ambulance services are responsive to emergency calls regardless of a transport agreement and that such agreements do not increase the quality of care received by patients.  (Trial Tr. vol. 3B, 38:21-39:12, DN 128).

The evidence cited by Defendants to support their suggested findings of fact is unpersuasive.  Defendants propose findings that transfer and transport agreements "have the benefit of optimizing patient outcomes" but do not cite to any medical evidence which supports this proposition.  (Defs.' Proposed Findings Fact & Conclusion Law ¶¶ 11-12).  Instead,

Defendants rely on the National Abortion Guidelines ("NAFG") and an opinion regarding the safety of office-based surgeries issued by the Kentucky Board of Medical Licensure ("KBML"). (Defs.' Proposed Findings Fact & Conclusions Law ¶¶ 11-12).  The NAFG guidelines, however, merely recommend that abortion facilities "consider developing . . . transfer agreement[s] with . . . hospital[s] outlining the means of communication and transport . . . for emergency transfer of care."  (Defs.' Trial Ex. DX01, at 51).  Similarly, the KBML opinion notes only that outpatient surgical facilities ordinarily "have a transfer protocol in effect with a hospital within reasonable proximity."  (Defs.' Trial Ex. DX02, at 12).  As Defendants' expert explained, however, an abortion facility may maintain an internal transfer protocol—and even develop transfer protocols that coordinate with the transferee hospital's protocols—without entering into an agreement with that hospital.  (Trial Tr. vol. 3B, 10:19-11:12, DN 128).  Thus, Defendants' cited authority is unpersuasive.

At trial, Dr. Hamilton noted that the American Medical Association Ambulatory Patient Safety Group reviewed a Florida study examining complications arising from ambulatory surgery centers and found that, in 143 instances of complications, 87 arose from cosmetic procedures, and only *four* were related to pregnancy terminations.  (Trial Tr. vol. 3B, 14:10-22, DN 128).  The Court finds that study and Dr. Hamilton's testimony about the Florida study unpersuasive.[16]

---

[16] This was the only study specifically referenced by Dr. Hamilton.  The study does not stand for the proposition that four pregnancy terminations resulted in emergency transfer of the patient; rather, the terminations resulted in a "reportable incident," which the study defines more broadly than a hospital transfer.  *See* Brett M. Coldiron et al., *Office Surgery Incidents:  What Seven Years of Florida Data Show Us*, 34 Dermatologic Surgery 285, 286-287 (2008).  Because the report does not conclude that the pregnancy terminations resulted in hospital transfers, this study offers no support for Defendants' position.

Dr. Cook corroborated Dr. Hillard's conclusion regarding the lack of any medical benefit of transfer agreements to abortion patients' care.  (Trial Tr. vol. 1A, 114:16-17, 115:10-13, DN 108).  She explained that in all her years at the University of Louisville, she could not recall one instance in which U of L Hospital failed to properly care for a patient suffering from an abortion complication—regardless of the existence of a transfer agreement with the hospital.  (Trial Tr. vol. 1A, 109:17-20, DN 108).  She further testified that, because hospitals follow internal protocols rather than the terms of a transfer agreement when receiving and caring for a transferee patient, the presence of a hospital transfer agreement does not affect a patient's clinical care.  (Trial Tr. vol. 1A, 110:14-16, 111:24-113:10, DN 108).  These protocols include assessing the patient to determine the appropriateness of a transfer, obtaining and reviewing the patient's medical record, and informing the physician who will be receiving the patient of the patient's needs.  (Trial Tr. vol. 1A, 111:24-113:10, DN 108).

The explicit function of a written transfer agreement required by KRS 216B.0435 is to have an agreement "by which . . . the hospital agrees to accept and treat [] patients" with unforeseen complications occurring at abortion facilities.  KRS 216B.0435(1).  This mandate, however, seems to be predicated on the notion that hospitals would have the option to choose *not* to provide medical care in these emergent situations.  This is not the case.  In fact, the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, requires that hospitals must provide care to all persons requesting and in need of emergency medical care.[17] *See* 42 U.S.C. § 1395dd(a), (b), (e)(2).  Thus, the existence or absence of a transfer agreement between an abortion facility and an acute care hospital has no effect on access to emergency

---

[17] EMTALA applies to all hospitals with emergency departments and that have signed a Medicare provider agreement with the federal government, which encompasses virtually all acute care hospitals.  *See* Nathan S. Richards, Note, *Judicial Resolutions of EMTALA Screen Claims at Summary Judgment*, 87 N.Y.U. L. Rev. 591, 592 n.3 (2012).

medical treatment because hospitals have no choice under EMTALA:  they *must* provide medical care to stabilize *all* emergency patients.  *See id.*  This universal requirement is well illustrated by the fact that, although no Louisville acute care hospital is presently willing to enter into a transfer agreement with EMW or Planned Parenthood, *every* hospital to which a transfer agreement was proposed has confirmed its willingness to treat any emergency patient presenting from an abortion facility.  (Pls.' Trial Exs. EMW-PX005, EMW-PX006, EMW-PX007; Intervenor-Pl.'s Trial Ex. PPINK-PX0057).

Similarly, Dr. Marshall explained that—at least at EMW—the presence of a transport agreement does not add to a woman's care because, regardless of whether it maintains such an agreement, EMW follows its internal protocols when responding to emergency situations.[18] (Trial Tr. vol. 1A, 66:11-13; DN 108, Trial Tr. vol. 1B, 36:7-15, 36:22-37:11, DN 112; Pls.' Trial Ex. EMW-PX207A).   Dr. Marshall testified that EMW dials 911 in the event of an emergency, and—given that Louisville Fire Engine Company No. 5's station is near the facility—emergency personnel from that facility usually respond.  (Trial Tr. vol. 1B, 27:21-28:4, 29:23-30:2, DN 112; Pls.' Trial Ex. EMW-PX202).  He further explained that "[t]he best thing to do [in the event of a medical emergency] is call 911 for EMS to come because their service is so much faster and their trucks are better equipped and their drivers are much better trained."  (Trial Tr. vol. 1B, 29:25-30:2, DN 112).

---

[18] EMW had a written transport agreement with Mercy Ambulance Service ("Mercy") since approximately 2008, under which the ambulance service agreed to pick up patients from EMW and transport them to a facility where they could receive care.  (Trial Tr. vol. 1B, 28:24-29:10, DN 112; *see also* Pls.' Trial Ex. EMW-PX042, at 2, 5).  Despite the written agreement with Mercy, CHFS rejected the transport agreement as deficient in 2017 because of technical noncompliance with Kentucky's regulations.  (*See* Pls.' Trial Ex. EMW-PX027, at 1-2).

Kentucky law also diminishes the utility of the required transport agreements.  At the time of the promulgation of 902 KAR 20:360E,[19] Kentucky law prohibited ambulance service providers from "refus[ing] a request for emergency service if a unit is available in the service area."  202 KAR 7:501, § 6(8) (2017); s*ee also* 202 KAR 7:501, § 6(3) (2017) ("Requests for emergency service shall be dispatched or notified within two (2) minutes of the call taker determining the correct address or location of the emergency incident site.").  Thus, similar to EMTALA's mandate that hospitals treat emergency patients, this regulation requires emergency transport by ambulance services regardless of the absence of any transport agreement.

In addition, the Chief of Public Services for Louisville Metro Government, Douglas Hamilton ("Chief Hamilton"), testified at trial about the necessity of transport agreements from an emergency response standpoint.  (Trial Tr. vol. 1C, 15:14-17, DN 110).  In his position, Chief Hamilton oversees LMEMS, a Ground 1 ambulance service providing the highest level of service.  (Trial Tr. vol. 1C, 15:21-24, 22:7-8, 22:11, DN 110).  According to Chief Hamilton, there are between 22 and 28 ambulances staffed at LMEMS at any time.  (Trial Tr. vol. 1C, 23:12-13, DN 110).  When an ambulance is dispatched, it will transport to the hospital of the patient's choice—even if that hospital is on diversion.[20]  (Trial Tr. vol. 1C, 32:9-20, DN 110).

---

[19] The regulations applicable to ambulance services have since been amended effective May 4, 2018.  The amended regulations are not at issue in this action.

[20] "Diversion" is when a hospital is not accepting patients due to mechanical problems, staffing issues, or illness.  (Trial Tr. vol. 1C, 30:20-31:14, DN 110).  Although Defendants emphasize diversions in addressing procedural due process, the possibility of a diversion does not alter the Court's findings as to the substantive due process claim.  While diversions occasionally occur, Chief Hamilton testified that the situations were not particularly noteworthy.  (Trial Tr. vol. 1C, 30:24-31:4, 31:15-22, DN 110).  In such event, LMEMS would still take a patient to the hospital of the patient's choice even if that hospital were on diversion.  (Trial Tr. vol. 1C, 32:9-20, DN 110).  This point further lacks significance since complications typically arise at home where a transfer or transport agreement is inapplicable.

When a call is received by 911 dispatch, the dispatcher does not inquire whether the caller has a transport agreement, and neither the existence nor the absence of such agreements affects the nature of LMEMS's response or its response time.  (Trial Tr. vol. 1C, 38:17-39:4, 39:9-12, DN 110).  Based on his experience, Chief Hamilton believed that transport agreements were unnecessary for patient safety or timely care.  (Trial Tr. vol. 1C, 39:23-40:4, DN 110).  According to Chief Hamilton, "the transport agreement [LMEMS] [has] with Planned Parenthood is one of the silliest things [he] [had] ever seen . . . because . . . it is in direct conflict with [LMEMS's] mission."  (Trial Tr. vol. 1C, 41:10-15, DN 110).  LMEMS had responded to 61 service calls for 51 incidents at EMW in the previous 24 months.  (Trial Tr. vol. 1C, 34:7-10, DN 110).  Of those calls, however, only three EMW patients needed transport directly from the clinic to a hospital.  (Trial Tr. vol. 1C, 34:11-15, DN 110).

In sum, the Court draws three conclusions from the evidence discussed above.  First, abortion patients are far more likely to experience complications after they have left the abortion facility.  Second, hospitals are required to treat patients with emergent conditions despite the absence of a transfer agreement, just like ambulance services transport their patients regardless of a transport agreement.  Finally, no evidence supports a finding that emergency response times are improved by the existence of a transfer or transport agreement.  Thus, the evidence reflects and the Court finds that transfer and transport agreements have no significant impact on the quality and timeliness of emergency medical care received by abortion patients who experience complications.

### ii.       Defendants Failed to Articulate a Medical Justification for the Challenged Regulations

Correspondingly, the record contains very little evidence suggesting that transfer and transport agreements improve the safety of abortions in Kentucky.  Dr. Hamilton admitted that

he was unaware of any studies demonstrating how patient care might improve if outpatient abortion facilities entered into transfer agreements with hospitals. (Trial Tr. vol. 3B, 12:17-18, DN 128). Absent such studies, then-Inspector General Silverthorn obviously could not have relied on them in promulgating the challenged regulations. In fact, as noted above, Silverthorn did not consult any physicians when drafting the challenged emergency regulations.[21] (Trial Tr. vol. 2A, 30:3-10, DN 115). As Inspector General Silverthorn testified regarding the extent of his knowledge of the safety of abortion procedures:

> Q.     Now, you're not aware of any time where a patient did not receive proper care due to a deficiency with either a hospital transfer agreement or an ambulance agreement; correct?
> A.     I do not have any knowledge of such.
> Q.     Right. And you're not aware of any instances in your tenure where the lack of a transfer or transport agreement caused harm to women; correct?
> A.     That is correct.
> Q.     And I believe your testimony was that you're not even sure of whether abortions are safer than births?
> A.     Other than the education I have had during the last 14, 15 months on this subject, I do not personally have anything to refute what has already been testified to in this trial.

(Trial Tr. vol. 2A, 10:17-11:4, DN 115). Accordingly, Defendants have not established any substantial justification for 902 KAR 20:360 Section 10.

### iii.     The Challenged Statute Will Negatively Impact Women's Health

EMW Plaintiffs and Planned Parenthood proffered testimony indicating that in the event KRS 216B.0435 is upheld, EMW—currently the state's only abortion facility—will likely be closed, thereby effectively depriving Kentucky women of their ability to obtain elective abortions in a medical facility in this state. (Hillard Expert Report ¶ 7, DN 63-1). The result

---

[21] Kentucky promulgated the relevant emergency regulation during the pendency of this action essentially adopting the stringent standards that the Inspector General applied when he informed EMW in March 2017 that its transfer and transport agreements were deficient.

would be that many women would either have to travel hundreds of miles to receive a clinical abortion or bear the risks of self-terminating their pregnancies without professional assistance.[22] (Trial Tr. vol. 1A, 88:19-21, DN 108).

This implication is significant, particularly in light of the fact that a large portion of Planned Parenthood's and EMW's patients have limited financial resources.  (Trial Tr. vol. 1B, 26:2-3, DN 112).   With limited means, these women will have difficulty affording travel to obtain an abortion, essentially leaving them two options:  (1) carrying their pregnancy to term, or (2) attempting to perform the abortion themselves or outside of a professional medical setting. (Trial Tr. vol. 1A, 73:4-8, 116:9-10, DN 108).

As Dr. Hillard testified, neither of these options is particularly safe:

> I fear that some of those women would carry a pregnancy to term, and that carries greater risks to—the risk of death, as I mentioned.  And I also fear that some of those women might choose to take the matter into their own hands and induce or try to induce an abortion on their own.  I think there are studies that suggest that women do that, even in today's age where many women have access to abortion.

(Trial Tr. vol. 1A, 73:9-10, DN 108).  Similarly, Dr. Cook testified that she has treated women who have received self-inflicted or illegal abortions, and that these women were often very sick and had to be x-rayed to ensure that they did not have some metal object inside of their abdomen. (Trial Tr. vol. 1B, 115:14-24, DN 112).

From the foregoing, the Court concludes that:  (i) transfer and transport agreements provide no quantifiable benefit to women's health; (ii) enforcing the challenged statute and regulations would pose a threat to the health and safety of women in Kentucky; and (iii) the challenged statute and regulations impose a significant burden upon women who are deciding whether to undergo an abortion.

---

[22] Dr. Cook testified that once a woman has decided that she is unable to continue a pregnancy, she will do everything in her power to end the pregnancy.  (Trial Tr. vol. 1A, 116:9-10, DN 108).

### C.    <u>Efforts to Comply with KRS 216B.0435 and 902 KAR 20:360 Section 10</u>

At trial, EMW Plaintiffs and Planned Parenthood presented evidence regarding their efforts to obtain the transfer and transport agreements required under Kentucky law. Both EMW and Planned Parenthood were unable to comply with the requirements to the satisfaction of the CHFS.

#### 1.    *EMW Plaintiffs*

Since at least September 12, 2008, EMW has had a transport agreement with Mercy. (Pls.' Trial Ex. EMW-PX042, at 5). In relevant part, the transport agreement provided:

> Mercy Ambulance . . . agrees to continue to provide medical transportation to EMW Women's Surgical Center patients in Louisville, Kentucky. Mercy Ambulance staff will give an estimated time when ambulance will arrive, at which time EMW can opt to wait for Mercy Ambulance service or call another ambulance service for transportation.

(Pls.' Trial Ex. EMW-PX042, at 5). On February 1, 2016, EMW entered into a new but nearly identical agreement with Mercy. (Pls.' Trial Ex. EMW-PX042, at 2).

Predating this litigation and EMW's license renewal in 2016, EMW also had a transfer agreement. In February 2014, EMW entered into an agreement executed by Dr. Sharmila Makhija, Chair of the OB/GYN Department at U of L Hospital. (Pls.' Trial Ex. EMW-PX025). The agreement specifically provided:

> For patient emergencies that require tertiary level care, we developed a protector for transitioning the care of parties to the University of Louisville Department of Obstetrics, Gynecology and Women's Health. Emergencies can consist of, but not limited to, suspected or identified perforations, extending cervical or vaginal lacerations, and postoperative hemorrhage. Once an emergency is identified and the EMW physician determines higher level care is required:
> 1.    The EMW physician will call the Gynecology pager . . . to identify the attending physician. If unable to reach the gynecology team, call the L&D physicians for assistance . . . .
> 2.    Pertinent patient information and transfer of care will be discussed with the gynecology team and attending.

3.   EMW will arrange ambulance transportation to the University of Louisville Hospital to resume care under the Department of Obstetrics, Gynecology, and Women's Health faculty.

4.   Medical records will be photocopied and transferred with the patient.

5.   Gynecology team will notify Emergency Room staff of pending patient transfer.

(Pls.' Trial Ex. EMW-PX025, at 1).

It appears uncontested by the parties that EMW's transfer and transport agreements did not face any significant scrutiny and were accepted by CHFS prior to 2017.  That changed after Silverthorn became Inspector General in July 2016.  (Trial Tr. vol. 2A, 9:7-11, DN 115).  While Silverthorn's predecessor had notified EMW on April 27, 2016, that its license had been renewed for June 2016 through May 2017, CHFS re-examined the transfer and transport agreements submitted by EMW under Silverthorn's watch.  (Pls.' Trial Ex. EMW-PX037, at 1; Trial Tr. vol. 2A, 32:13-20, DN 115).

On March 13, 2017, Silverthorn wrote to EMW outlining its purported failures to comply with Kentucky law.  (Pls.' Trial Ex. EMW-PX027, at 1-2; Trial Tr. vol. 2A, 32:13-20, DN 115).  In particular, he noted:  (i) the transfer agreement was not signed by an acceptable representative of U of L Hospital; (ii) his suspicion that the agreement may no longer be valid because U of L Hospital had previously withdrawn from a prior agreement; (iii) the named transferee was incorrect; and (iv) the transport agreement did "not mandate with reasonable certainty the transport of the licensee's patients" to the acute care hospital named in the transfer agreement.  Despite Silverthorn's criticism, it does not appear that these points violated either the statute or regulation in existence at the time.  (Pls.' Trial Ex. EMW-PX027, at 1-2; Trial Tr. vol. 2A, 32:13-20, DN 115).

In response to Silverthorn's letter, EMW and Mercy signed an addendum to their existing agreement providing that "[f]or clarification, this shall include providing medical transportation to University Medical Center Inc., a/k/a University Hospital or the hospital selected by the patient." (Pls.' Trial Ex. EMW-PX033, at 1). EMW contacted U of L Hospital requesting the signature of a hospital administrator on the transfer agreement, which was subsequently signed by Ken Marshall ("Marshall") as President/CEO on March 20, 2017. (Pls.' Trial Ex. EMW-PX063, at 1-2; Pls.' Trial Ex. EMW-PX025, at 1). Marshall then promptly about-faced and canceled the transfer agreement on the same day because he was concerned that he did not have the authority to sign the agreement. (K. Marshall Dep. 35:15-25, June 22, 2017, DN 136-1).

On March 23, 2017, Silverthorn sent an e-mail message to EMW's counsel agreeing to grant an extension to April 3, 2017, for EMW to comply with the transfer and transport agreement requirements. (Pls.' Trial Ex. EMW-PX034, at 1). Silverthorn also attached a document notifying EMW that the OIG was imposing additional requirements not provided by the statute or regulation at the time, including: (i) geographic limitations (in terms of proximity to the abortion facility) as to the acute care hospital entering into the transfer agreement; (ii) the authorized representatives who could sign a transfer agreement on behalf of an acute care hospital, and (iii) the obligation that the contracted ambulance service respond immediately and take the patient to the acute care facility that had entered into the transfer agreement with the abortion facility unless otherwise directed by the patient. (Pls.' Trial Ex. EMW-PX034, at 2).

On March 29, 2017, EMW Plaintiffs filed this lawsuit challenging the Kentucky laws requiring transfer and transport agreements for abortion clinics. On March 31, 2017—the same day this Court entered its temporary restraining order prohibiting the enforcement of the challenged laws—Silverthorn sent a letter to EMW seeking to clarify the prior correspondence

from March 13 and 24.  (Defs.' Trial Ex. DX12).  In particular, Silverthorn noted that he would authorize the revocation of EMW's license if it failed to comply with the transport and transfer agreement requirements by April 3, 2017, and that the "revocation . . . shall become final and conclusive thirty (30) days after notice is given, unless the applicant or licensee, within the thirty (30) day period, shall file a request in writing for a hearing with [] [CHFS]."  (Defs.' Trial Ex. DX12, at 1 (internal quotation marks omitted) (quoting KRS 216B.105(2))).

Notwithstanding this litigation and the temporary restraining order (which later became a preliminary injunction), EMW continued to seek transfer agreements with acute care facilities. On July 27, 2017, Dr. Marshall wrote letters to the presidents of local hospitals requesting their participation in a more extensive transfer agreement and providing a copy of the proposed agreement.  (Pls.' Trial Ex. EMW-PX180, at 1-8; Pls.' Trial Ex. EMW-PX181, at 1-8; Pls.' Trial Ex. EMW-PX182, at 1-8).  Every hospital refused to sign the proposed agreements, but each confirmed it would provide care to anyone seeking emergency treatment.  (Pls.' Trial Ex. EMW-PX005, at 1; Pls.' Trial Ex. EMW-PX007, at 1; Pls.' Trial Ex. EMW-PX006, at 1).

Thus, based on the evidence in the record, the Court finds that, despite the best efforts of EMW Plaintiffs, they are unable to obtain transfer and transport agreements as required by KRS 216B.0435.[23]  Unless EMW is able to obtain these agreements or a waiver of the transfer agreement requirement, it will cease to provide abortion services in Kentucky.

### 2.    *Planned Parenthood*

As discussed above, CHFS rejected the transfer agreements provided by Planned Parenthood with University of Kentucky Hospital and Clark Memorial Hospital in Indiana.

---

[23] Although local ambulances services have been willing to sign a transport agreement, such agreements cannot pass muster because they must reference a valid transfer agreement with a hospital to which the ambulance services are required to transfer the patients absent some other directive from the patients.  *See* 902 KAR 20:360, § 10(4)(c)(4) & (5).

(Trial Tr. vol. 3A, 27:12-28:17, 33:21-34:17, DN 126; Intervenor-Pl.'s Trial Exs. PPINK-PX0010, PPINK-PX0011, PPINK-PX0012, PPINK-PX0014).  No other Louisville area hospital has been willing to sign transfer agreements with Planned Parenthood.  Without a transfer agreement in place meeting the current requirements of 902 KAR 20:360 Section 10, Planned Parenthood is unable to meet the statutory requirements for a license to provide abortion services.  (Trial Tr. vol. 3A, 34:18-23, DN 126).

     **D.**     <u>**Effects of KRS 216B.0435 and 902 KAR 20:360 Section 10 on EMW Plaintiffs, Planned Parenthood, and the Availability of Abortions in Kentucky**</u>

The evidence presented at trial established that neither EMW nor Planned Parenthood has been able to satisfy the requirements of KRS 216B.0435 and 902 KAR 20:360 Section 10, as revised.  While the pre-2017 regulation was not, on its face, an impediment to obtaining licensure, Silverthorn's interpretation of the prior regulation as applied to EMW's transfer and transport agreements resulted in the threatened revocation of EMW's license and the Commonwealth's decision not to issue a license to Planned Parenthood.  The present version of 902 KAR 20:360 Section 10, both as written and as applied, would prevent EMW's continued operation as an abortion facility and would likewise preclude the licensure of Planned Parenthood's abortion facility.

Though Defendants have pointed to the OIG's discretion to waive the required agreements for successive ninety-day periods, the record demonstrates that the uncertainty of a discretionary waiver would make it exceedingly difficult for an abortion facility to survive.  Such facilities would not likely be able to hire and keep staff without knowing whether they could continue operating beyond ninety days, and no prudent organization would risk millions of dollars investing in such a facility whose temporary license would be based on the administrative

whim of the Inspector General.  (Trial Tr. vol. 1B, 79:24-81:20, DN 112; Trial Tr. vol. 2A, 80:16-23, DN 115; Trial Tr. vol. 2B, 87:9-88:2, 104:11-20, DN 116; Trial Tr. vol. 3A, 51:24-52:8, DN 126).

If EMW ceased to perform abortions in Kentucky, there would be no abortion facilities within the Commonwealth.  As a result, Kentucky women seeking an abortion would have to travel to another state for abortion services.  This impediment would likely mean that some women would not be able to exercise their constitutional right to have an abortion, and women still seeking abortions would incur greater costs and spend more time traveling to abortion facilities in other states.  These challenges pose a substantial burden on Kentucky women.  The absence of abortion services in Kentucky would result in expected delays in care and cause a higher risk of complications.  The unavailability of legal abortions in Kentucky would also likely increase the number of self-performed, unlicensed, and unsafe abortions for Kentucky women. (Trial Tr. vol. 1A, 73:11-15, 116:6-11, DN 108).

KRS 216B.0435 and 902 KAR 20:360 Section 10 provide no meaningful benefit to women's health.  On the other hand, the enforcement of these laws creates an impediment to the availability of abortions by virtually assuring that abortion facilities will not operate in Kentucky, which in turn poses a risk to women's health.  Thus, the burdens imposed by these laws regulating abortion far outweigh any benefits to Kentucky women.

## IV.    CONCLUSIONS OF LAW

As the Kentucky Supreme Court noted in 2016, "[a]bortion is likely the most divisive issue in a divisive political culture.  . . . [T]he issues of abortion and access to those procedures stoke the passions of the collective body politic like no others . . . ."  *Eubanks & Marshall of Lexington, PSC v. Commonwealth*, No. 2016-SC-000328-I, 2016 WL 4555927, at *3 (Ky. Aug.

25, 2016).  Of course, no moral or religious considerations bear on the resolution of this dispute, for it is well-settled that the fundamental right to privacy contained in the Due Process Clause of the Fourteenth Amendment protects a woman's right to choose to have an abortion, subject to certain limitations.  *See Roe*, 410 U.S. at 153.  Nevertheless, as the U.S. Supreme Court has repeatedly recognized, while there is a constitutional right to have an abortion, states also have "a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that [e]nsure maximum safety for the patient."  *Id.* at 150; *see also Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992); *Whole Woman's Health*, 136 S. Ct. at 2309 (internal quotation marks omitted) (quoting *Roe*, 410 U.S. at 150).

As a preliminary matter, Defendants challenge the standing of EMW Plaintiffs and Planned Parenthood to assert some of the claims in this action.  *See Long John Silvers, Inc. v. Nickleson*, 923 F. Supp. 2d 1004, 1010 (W.D. Ky. 2013).  In challenging Defendants' actions, Plaintiffs have asserted various claims under the U.S. Constitution.  In particular, EMW Plaintiffs and Planned Parenthood claim that:  (i) Defendants' actions violated their substantive due process rights under the Fourteenth Amendment; and (ii) Kentucky law improperly allows hospitals and ambulance services to determine whether abortion facilities are licensed through the requirement of transfer and transport agreements, which constitutes an unlawful delegation in violation of the Fourteenth Amendment.  (Pls.' Verified Compl. ¶¶ 56-57, 60-61; Intervenor-Pl.'s Compl. ¶¶ 55-63, 73-77).  Planned Parenthood additionally alleges that Defendants violated its right of equal protection under the Fourteenth Amendment.  (Intervenor-Pl.'s Compl. ¶¶ 64-67). Each of these issues and claims is addressed below.[24]

---

[24] In addition, EMW Plaintiffs and Planned Parenthood made claims for procedural due process violations, Planned Parenthood asserted claims under the Full Faith and Credit Clause and for void-for-vagueness, and EMW Plaintiffs made a claim of First Amendment retaliation.  (Pls.'

A.     **Standing**

The Court must first consider Defendants' contention that EMW Plaintiffs and Planned Parenthood lack standing to assert some of their claims in this case.  (Defs.' Post-Trial Br. 42-45).  Specifically, Defendants claim that Planned Parenthood lacks first-party and third-party standing to assert a substantive due process claim because it lacks a current license to operate as an abortion facility.  (Defs.' Post-Trial Br. 42-43).  Defendants also argue that EMW Plaintiffs cannot assert their substantive due process claim on behalf of their prospective patients because there are "genuine conflicts" between their interests and those of their patients, and their patients do not face any hindrance to assert their own claims.[25]  (Defs.' Post-Trial Br. 43-44).

"Standing is the threshold question in every federal case.  The Supreme Court has stated that the standing requirement limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into a vehicle for the vindication of the value interests of concerned bystanders."  *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (internal quotation marks omitted) (internal citation omitted) (citation omitted).  As a result, standing "is a jurisdictional requirement."  *Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915 (6th Cir. 2002).

---

Verified Compl. ¶¶ 58-59, 62-63; Intervenor-Pl.'s Compl. ¶¶ 68-72, 78-86).  Because EMW Plaintiffs and Planned Parenthood failed to address these claims in their pre- and post-trial filings and did not present proof on these claims at trial, these claims will be dismissed as waived.  *See DW Data, Inc. v. C. Coakley Relocation Sys., Inc.*, 951 F. Supp. 2d 1037, 1047 (N.D. Ill. 2013); *Christen G. v. Lower Merion Sch. Dist.*, 919 F. Supp. 793, 799 (E.D. Pa. 1996); (*see* Intervenor-Pl.'s Proposed Findings Fact & Conclusions Law 53 n.13).

[25] Defendants also contend that EMW Plaintiffs and Planned Parenthood cannot assert third-party claims on behalf of medical residents.  (Defs.' Post-Trial Br. 45).  EMW Plaintiffs and Planned Parenthood's Complaints make no such claims, so this point is moot.

1.      *Planned Parenthood – First-Party Substantive Due Process Claim*

Planned Parenthood must establish that it has first-party standing to assert its substantive

due process claim.  As the Sixth Circuit has explained:

> [A] plaintiff must [] satisfy three prudential standing restrictions.  First, a plaintiff
> must "assert his own legal rights and interests, and cannot rest his claim to relief
> on the legal rights or interests of third parties."  Second, a plaintiff's claim must be
> more than a "generalized grievance" that is pervasively shared by a large class of
> citizens.  Third, in statutory cases, the plaintiff's claim must fall within the "zone
> of interests" regulated by the statute in question.  These additional restrictions
> enforce the principle that, "as a prudential matter, the plaintiff must be a proper
> proponent, and the action a proper vehicle, to vindicate the rights asserted."

*Coyne*, 183 F.3d at 494 (internal citations omitted) (citation omitted).

Defendants argue that Planned Parenthood lacks first-party standing because a first-time

applicant for a license to operate an abortion facility "do[es] not have a property interest so as to

entitle [it] to procedural or substantive due process rights in the same way that an existing permit

holder might demand."  *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)

(internal quotation marks omitted) (quoting *Wojcik v. City of Romulus*, 257 F.3d 600, 610 (6th

Cir. 2001)).  *Baird*, however, dealt with the procedural due process rights of a first-time abortion

facility applicant, and therefore utilized the quoted language from *Wojcik*—an entertainment

permit case—as dicta in relation to a procedural due process claim.  Furthermore, in this instance

Planned Parenthood was not a mere applicant but had been informed by CHFS that it could begin

providing abortion services at the time the challenged regulations became an issue.[26]  *See Baird*,

438 F.3d at 611-12 & n.11 (noting that plaintiffs have a constitutionally-protected property

---

[26] Defendants' characterization of Planned Parenthood's status as a mere license applicant, as
well as their contention that Planned Parenthood provided "23 unlicensed and illegal abortions []
during December 2015 and January 2016" is not well-taken.  (Defs.' Post-Trial Br. 43).  As
discussed in the Court's findings of fact, Planned Parenthood was advised by then-Inspector
General Mynear that its application was in order such that it could perform abortions in
anticipation of an inspection that would complete the licensing process.  (Trial Tr. vol. 2B,
74:10-19, 82:6-15, DN 116; Intervenor-Pl.'s Trial Ex. PPINK-PX0213).

interest in the continued operation of an existing business).  Planned Parenthood therefore has standing to pursue its first-party substantive due process claim.

## 2.    *Third-Party Substantive Due Process Claims*

Defendants contend that Planned Parenthood cannot "assert third-party claims on behalf of future, hypothetical patients . . . with whom it 'has no relationship.'"  (Defs.' Post-Trial Br. 43 (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004) (declining to confer third-party standing where "a future attorney-client relationship with as yet unascertained Michigan criminal defendants" was at issue))).  Similarly, Defendants contend that EMW Plaintiffs cannot maintain a third-party substantive due process claim because of the lack of a "close relationship" to the third party and because there is no true hindrance to abortion patients' ability to assert their own legal claims.  (Defs.' Post-Trial Br. 43-44).

Third-party standing exists "where the litigants challenge statutes which regulate their activity and, as a result, violate the rights of third parties."  *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987).  When asserting these types of claims, plaintiffs "have uniformly been permitted to assert the rights of the affected third parties."  *Id.* (citing *Craig v. Boren*, 429 U.S. 190, 194-97 (1976); *Eisenstadt v. Baird*, 405 U.S. 438, 443-46 (1972)); *see also Singleton v. Wulff*, 428 U.S. 106, 117 (1976) ("Aside from the woman herself, therefore, the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, that decision."); *Haskell v. Wash. Twp.*, 635 F. Supp. 550, 551-55 (S.D. Ohio 1986), *rev'd on other grounds*, 864 F.2d 1266 (6th Cir. 1988) (holding that a doctor has first- and third-party standing to challenge a law that would have prevented him from opening an abortion clinic).

Defendants' challenge to the third-party standing of both EMW Plaintiffs and Planned Parenthood contradicts well-established law that abortion providers have standing to sue on behalf of their patients.  This argument is therefore rejected.

### B.  <u>Fourteenth Amendment – Substantive Due Process</u>

Women in the United States have "a substantive due-process right to terminate a pregnancy before the fetus is viable."  *W. Ala. Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1248 (M.D. Ala. 2017); *see also Roe*, 410 U.S. at 153.  EMW Plaintiffs and Planned Parenthood challenge the constitutionality of KRS 216B.0435 and 902 KAR 20:360 Section 10 both as applied and facially.  (Pls.' Verified Compl. ¶ 57; Intervenor-Pl.'s Compl. ¶¶ 57, 60).

### 1.  *As-Applied Challenge*

In an as-applied challenge, a court must determine the constitutionality of the challenged laws as applied to the parties before the court.  *See generally City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758-59 (1988).  In this case, EMW Plaintiffs and Planned Parenthood's primary argument is that the challenged laws impose an undue burden upon the right of women to obtain an abortion.  (Pls.' Verified Compl. ¶¶ 56-57; Intervenor-Pl.'s Compl. ¶¶ 55-63).  As outlined below, the challenged laws are unconstitutional as applied to EMW Plaintiffs and Planned Parenthood.

### a.  **Legal Standard**

While states may pass laws regulating abortion, such regulation cannot impose an undue burden on a woman's right to obtain an abortion.  *See Casey*, 505 U.S. at 878, 881.  "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."  *Id.* at 877.  "[A] statute which . . . has the [purpose or] effect of placing a substantial

44

obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Id.*; *Whole Woman's Health*, 136 S. Ct. at 2309. Defendants' contention that the Court should apply rational basis analysis flies in the face of *Casey* and the recent decision in *Whole Woman's Health*, and is wholly without merit.

Undue burden analysis requires courts to "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health*, 136 S. Ct. at 2309 (citing *Casey*, 505 U.S. at 887-98). In balancing these interests, courts may "place[] considerable weight upon evidence and argument presented in judicial proceedings" and need not leave questions of medical uncertainty to be resolved by the legislative branch. *Id.* at 2310 "Court[s] retain[] an independent constitutional duty to review factual findings where constitutional rights are at stake." *Gonzales v. Carhart*, 550 U.S. 124, 165 (2007) (citing *Crowell v. Benson*, 285 U.S. 22, 60 (1932)).

In analyzing whether the burden imposed by an abortion regulation is undue, courts must consider the impact of the regulation on the closure of abortion facilities and reduction in the number of abortion providers within the state. *See Whole Woman's Health*, 136 S. Ct. at 2313. Courts must also examine "additional burden[s]" faced by women as a result of reduced abortion access, which may include "longer waiting times, [] increased crowding", and "increased driving distances" to obtain abortion services. *Id.* "Courts are free to base their findings on commonsense inferences drawn from the evidence." *Id.* at 2317; *see also id.* (accepting the trial court's inference that closing four of five abortion clinics in Texas would overload the remaining facility's capacity to perform abortion procedures).

In the U.S. Supreme Court's most recent decision addressing the regulation of abortions, the Court struck down a Texas law requiring physicians to maintain hospital admitting

45

privileges.  *See id.* at 2318.  The Court noted that even before the imposition of the admitting privileges requirements, Texas abortion facilities were safe and were required to "meet a host of health and safety requirements."  *Id.* at 2314.  The Court "found nothing in Texas' record evidence that show[ed] that, compared to prior law (which required a 'working arrangement' with a doctor with admitting privileges), the new law advanced Texas' legitimate interest in protecting women's health."  *Id.* at 2311; *see also id.* at 2311-12 ("[W]hen directly asked at oral argument whether Texas knew of a single instance in which the new requirement would have helped even one woman obtain better treatment, Texas admitted that there was no evidence in the record of such a case." (citation omitted)).

After reasoning that the law provided little to no benefit to women's health, the Supreme Court found that the challenged regulation "place[d] a 'substantial obstacle in the path of a woman's choice.'"  *Id.* at 2312 (quoting *Casey*, 505 U.S. at 877).  In analyzing that burden, the Court considered the cumulative effect of the statute's impact and focused its analysis on whether the law's purported benefits justified the burdens.  The Court reasoned:

> In our view, the record contains sufficient evidence that the admitting-privileges requirement led to the closure of half of Texas' clinics, or thereabouts.  Those closures meant fewer doctors, longer waiting times, and increased crowding. Record evidence also supports the finding that after the admitting-privileges provision went into effect, the "number of women of reproductive age living in a county . . . more than 150 miles from a provider increased from approximately 86,000 to 400,000 . . . and the number of women living in a county more than 200 miles from a provider from approximately 10,000 to 290,000."  We recognize that increased driving distances do not always constitute an "undue burden."  But here, those increases are but one additional burden, which, when taken together with others that the closings brought about, and when viewed in light of the virtual absence of any health benefit, lead us to conclude that the record adequately supports the District Court's "undue burden" conclusion.

*Id.* at 2313 (internal citations omitted); *see also Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272, 1287 (M.D. Ala. 2014) ("[T]he heart of this test is the relationship between the

severity of the obstacle and the weight of justification the State must offer to warrant that obstacle.  . . . [T]he more severe the obstacle a regulation creates, the more robust the government's justification must be, both in terms of how much benefit the regulation provides towards achieving the State's interests and in terms of how realistic it is the regulation will actually achieve that benefit."  (internal citations omitted)); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 798 (7th Cir. 2013) ("The feebler the [articulated state interest], the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous."). The Court further explained that the regulations would require approximately half of the abortion facilities in Texas to close, resulting in "fewer doctors, longer waiting times, and increased crowding."  *Id.* at 2313.  Because the burdens imposed by the regulations vastly outweighed the "virtual absence" of any benefits derived therefrom, the Supreme Court held the regulation was unconstitutional under *Casey*.  *See Whole Woman's Health*, 136 S. Ct. at 2313.

Thus, the Supreme Court's recent decision in *Whole Woman's Health* has further clarified the test articulated in *Casey*.  This Court will apply that analysis in addressing the substantive due process claims.

### b.     KRS 216B.0435 and 902 KAR 20:360 Section 10 Place an Undue Burden on Women's Right to Decide Whether to Have an Abortion

#### i.     Kentucky's Interest in Improving Women's Health

Based on the evidence and the findings of fact outlined above—as well as all reasonable inferences drawn from the facts—the Court concludes that the transfer and transport agreements required by Kentucky law provide virtually no health benefits to women.  Similar to the challenged laws in *Whole Woman's Health*, neither KRS 216B.0435 nor 902 KAR 20:360

Section 10 advances Kentucky's interest in protecting women's health and safety. *See Whole Woman's Health*, 136 S. Ct. at 2311.

All evidence submitted in this matter establishes that abortion procedures performed in Kentucky are safe.[27]  In fact, Dr. Marshall testified that he has performed approximately 3,000 abortions a year for nearly 40 years and that he has never had a patient die because of the procedure.  (Trial Tr. vol. 1B, 23:9-20, DN 112).  He further explained that the ratio of hospital admissions to abortions is about one in 2,000.  (Trial Tr. vol. 1B, 23:14-16, DN 112).  Moreover, when complications arise, they typically occur long after women have left the abortion facility. (Trial Tr. vol. 1A, 57:24-58:19, DN 108).  In those situations, women travel directly to the nearest emergency room—especially if the abortion facility where they had the procedure is not nearby.  (Trial Tr. vol. 1A, 58:12-19, DN 108).  Therefore, the existence or absence of transfer or transport agreements between abortion clinics and hospitals or ambulance services has no impact on the vast majority of the rare post-abortion complications.

Just as in *Whole Woman's Health*, even in the exceptional case where complications arise while women are still at the abortion facility, there is no evidence in the record that any complications from abortions performed in Kentucky have been treated improperly in even one instance or that negative outcomes would have been avoided if an abortion facility had a transfer

---

[27] Although the Court's findings are based on the evidence presented in this case, other courts have uniformly reached the same conclusion. *See, e.g.*, *Planned Parenthood of the Heartland v. Reynolds ex rel. State*, No. 17-1579, 2018 WL 3192941, at *4 (Iowa June 29, 2018); *June Med. Servs., LLC v. Kliebert*, 250 F. Supp. 3d 27, 58 (M.D. La. 2017); *Whole Woman's Health*, 136 S. Ct. at 2315; *Planned Parenthood of The Great Nw. v. State*, 375 P.3d 1122, 1141 (Alaska 2016); *Van Hollen*, 94 F. Supp. 3d at 970; *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 769 F.3d 330, 350 (5th Cir. 2014); *Planned Parenthood Ariz., Inc. v. Humble*, 13 F. Supp. 3d 1017, 1022 (D. Ariz.), *rev'd and remanded*, 753 F.3d 905 (9th Cir. 2014); *Stuart v. Loomis*, 992 F. Supp. 2d 585, 590 (M.D.N.C. 2014); *N. Fla. Women's Health & Counseling Servs., Inc. v. State*, 866 So. 2d 612, 652 (Fla. 2003); *Doe v. Bolton*, 410 U.S. 179, 217 (1973) (Douglas, J., concurring).

or transport agreement in place.  *See Whole Woman's Health*, 136 S. Ct. at 2311-12.  The evidence reflects that LMEMS is responsive to 911 calls and a municipal fire station is in close proximity to EMW's facility regardless of whether EMW has a contract with LMEMS to provide emergency transport.  (Trial Tr. vol. 1C, 27:3-15, 28:4-5, 28:16-30:15, DN 110).  Moreover, Inspector General Silverthorn conceded that he was unaware of any incident where a woman received improper care due to a deficient transfer or transport agreement, or to the lack of such an agreement.  (Trial Tr. vol. 2A, 10:17-11:4, DN 115).  Dr. Hamilton similarly admitted that he was neither aware of any Kentucky women receiving improper care as a result of the absence of a transfer agreement, nor did he know of any study addressing the impact of such agreements. (Trial Tr. vol. 3A, 112:1-3, 118:23-119:3, DN 126; Trial Tr. vol. 3B, 12:15-18, DN 128).

As the Supreme Court noted in *Whole Woman's Health* with regard to the admitting privileges requirement for Texas abortion facilities, "there was no significant health-related problem that the new law helped to cure."  *Whole Woman's Health*, 136 S. Ct. at 2311.  This statement is equally applicable to the Kentucky laws at issue here.

In sum, the record in this case demonstrates that the challenged regulations do not advance a legitimate interest in promoting the health of women seeking abortions in Kentucky. Based on *Whole Woman's Health* and the medical evidence in the record, the Court concludes that the challenged regulations are not medically necessary and do absolutely nothing to further the health and safety of women seeking abortions in the Commonwealth of Kentucky.

### ii.    Burdens Imposed on Women

The burden imposed by the regulations at issue relates to their impact on abortion accessibility.  As noted, the regulations will effectively eliminate legal abortion in Kentucky by closing the only operating abortion facility—EMW—and make it unlikely that any new abortion

49

facility will open in Kentucky. This is problematic. The evidence reflects that, in 2016, roughly 2,800 women obtained abortions in Kentucky. (Trial Tr. vol. 3B, 7:7-18, DN 128). Given that EMW performed almost all of those procedures, the closure of EMW and Planned Parenthood's inability to obtain licensure for its new Louisville facility would prevent virtually all Kentucky women from obtaining abortions within this state. (Trial Tr. vol. 2A, 7:17-18, DN 115).

Women who are unable to access abortions at licensed abortion facilities are subject to a number of burdens and risks. For instance, these women may resort to self-performed, unlicensed, and unsafe abortion procedures. (Trial Tr. vol. 2A, 7:17-18, DN 115); *see Whole Woman's Health*, 136 S. Ct. at 2321 (Ginsburg, J., concurring) ("When a State severely limits access to safe and legal procedures, women in desperate circumstances may resort to unlicensed rogue practitioners, *faute de mieux*, at great risk to their health and safety."); *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1362-63 (M.D. Ala. 2014) (noting that state regulation makes it significantly more difficult to obtain a legal abortion, and such difficulty "creates a greater risk that women would attempt to obtain an abortion illegally without medical supervision," or "[a]t worst, there is a danger that women would attempt surgical abortions on themselves."). Alternatively, in the absence of any licensed abortion facilities in Kentucky, women would have to travel to other states for legitimate abortion services. (Trial Tr. vol. 1A, 88:19-21, DN 108). Many of those women would be traveling much longer distances to receive abortion services, which would impose a severe burden—particularly for low-income women who compose a majority of Kentucky abortion patients. *See Whole Woman's Health*, 136 S. Ct. at 2313 (recognizing that women seeking abortions are burdened by having to travel long distances to obtain them). Without the choice of an abortion, a woman's only other option

50

would be to carry the pregnancy to term—an option that carries with it significant health risks. (Trial Tr. vol. 1A, 73:9-10, DN 108).

Contending that the regulations do not impose an unconstitutional burden on a woman's access to abortion, Defendants point to the availability of abortion facilities in other states. At trial, Defendants presented several charts depicting the mileage from various Kentucky cities to abortion facilities in Indiana, Missouri, Ohio, Tennessee, and West Virginia, and maps reflecting radii of 125, 150, and 200 miles from abortion facilities in those other states. (Defs.' Trial Exs. 13-16).

Notwithstanding the fact that these charts do not demonstrate the actual distance women would have to travel to obtain an abortion, the availability of abortion services in other states does not cure the infirmities presently imposed by Kentucky law. Defendants' contention that it can trample upon the rights of Kentucky women because those rights could be exercised in other states is without merit. As the U.S. Supreme Court stated *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938):

> [E]ach [state is] responsible for its own laws establishing the rights and duties of persons within its borders. It is an obligation the burden of which cannot be cast by one State upon another, and no State can be excused from performance by what another State may do or fail to do. That separate responsibility of each State within its own sphere is of the essence of statehood maintained under our dual system.

*Id.* at 350. Recognizing that *Gaines* involved an equal protection challenge to a law school's refusal to admit an African-American applicant, the concept is equally applicable here. Most assuredly, Kentucky could not defend a gag order on its citizens by suggesting that they could travel to Tennessee or Ohio to exercise their rights to free speech. Other courts have reached this same conclusion regarding states' unconstitutional restrictions on abortion rights. *See, e.g.*, *W. Ala. Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1261 n.11 (M.D. Ala. 2017) ("Moreover,

although some women in Alabama could continue to access abortions beginning at 15 weeks by traveling out of state, courts have refused to allow out-of-jurisdiction access to cure within-jurisdiction restrictions."  (citations omitted)); *Strange*, 33 F. Supp. 3d at 1360-61 ("[T]he State could identify no precedent for a court to consider conduct outside the political boundaries of a jurisdiction in order to justify the constitutionality of actions by that jurisdiction.   On the contrary, in areas ranging from First Amendment free speech to Fourteenth Amendment equal protection to Second Amendment firearm rights, courts have refused to allow out-of-jurisdiction access to cure within-jurisdiction restrictions."); *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 918 (7th Cir. 2015) ("The logic of the state's position is that it could forbid both abortion clinics in Milwaukee to perform abortions on anyone living in that city, given that the Chicago clinics are only about 90 miles away (and one clinic, in the northern suburbs of Chicago, is only 74 miles from Milwaukee's city center).   The state's position is untenable. . . . [T]he proposition that 'the harm to a constitutional right [can be] measured by the extent to which it can be exercised in another jurisdiction . . . [is] a profoundly mistaken assumption.'"  (alterations in original) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011))); *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 457 (5th Cir. 2014) ("[A] state cannot lean on its sovereign neighbors to provide protection of its citizens' federal constitutional rights, a principle that obviously has trenchant relevance here.   Pre-viability, a woman has the constitutional right to end her pregnancy by abortion.   H. B. 1390 effectively extinguishes that right within Mississippi's borders.   *Gaines* locks the gate for Mississippi to escape to another state's protective umbrella and thus requires us to conduct the undue burden inquiry by looking only at the ability of Mississippi women to exercise their right within Mississippi's borders."  (discussing *Gaines*)).

Under the considerable authority of these precedents, the Court rejects Defendants' invitation to consider the availability of abortion clinics in other states in evaluating the burdens placed on Kentucky women's access to such facilities.  Kentucky simply cannot foist upon sister states its obligation to provide constitutional protections to its own citizens.  Thus, the Court concludes the challenged laws will effectively eliminate the availability of safe abortions to women in Kentucky.

### iii.  The Burdens Imposed by KRS 216B.0435 and 902 KAR 20:360 Section 10 Vastly Outweigh Their Benefits

As the Supreme Court held in *Whole Woman's Health*, courts must "consider the burdens a law imposes on abortion access together with the benefits those laws confer."  *Whole Woman's Health*, 136 S. Ct. at 2309 (citing *Casey*, 505 U.S. at 887-98).  "[A] state may impose restrictions on the woman's access to an abortion . . . that serve some [] valid state interest; however, a state may not erect procedural hurdles in the path of a woman seeking an abortion simply to make it more difficult for her to obtain an abortion."  *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 461 (6th Cir. 1999).

The Court has carefully reviewed the evidence presented in this case and concludes that the record is devoid of any credible proof that the challenged regulations have any tangible benefit to women's health.  On the other hand, the regulations effectively eliminate women's rights to abortions in the state.  Therefore, the challenged regulations are unconstitutional.  Even if the challenged regulations furthered women's health to a minimal degree, the burdens would still outweigh any such feeble benefit and constitute an undue burden to women's access to abortions in Kentucky.

Defendants point to *Women's Medical Professional Corp. v. Baird* as validation of the challenged restrictions.  In *Baird*, the only abortion facility in Dayton, Ohio, was unable to

obtain a written transfer agreement with a local hospital, which was required by Ohio law.  *See Baird*, 438 F.3d at 597.  After the clinic's application for a waiver of that requirement was denied, the clinic filed suit against the Director of the Ohio Department of Public Health ("ODH") alleging, *inter alia*, that the regulation constituted an undue burden on women's rights to abortions as applied to that facility.  *See id.*  The trial court granted a permanent injunction prohibiting the enforcement of the regulation against the clinic, which the ODH appealed.  *See id.*

Applying *Casey*, the Sixth Circuit considered "whether the closing of an abortion clinic, requiring its approximately 3,000 patients per year to travel to another clinic for abortion services, constitutes an undue burden on a woman's right to choose to have an abortion."  *Id.* at 604.  The court concluded that the closure of the Dayton clinic did not constitute a substantial obstacle to women seeking abortions because they could travel to abortion clinics in other Ohio cities—e.g., Cincinnati, Columbus, Cleveland, and Akron.  *See id.* at 605.  "Thus, potential patients of the Dayton clinic could still obtain an abortion *in Ohio* . . . ."  *Id.* (emphasis added).  While acknowledging that women would have to travel greater distances, the court concluded that that fact alone did not constitute an undue burden.[28]  *See id.* at 605-06.

By contrast, EMW's closure would eliminate entirely the availability of legal abortions in Kentucky because there would be no remaining abortion facilities within the Commonwealth.  Likewise, the inability of both EMW and Planned Parenthood to obtain satisfactory transfer agreements and the lack of any history of the granting of waivers to those requirements distinguish this case from *Baird*.  Unlike in *Baird*, the closure of EMW would result in women

---

[28] *Baird* is also distinguishable because the Sixth Circuit concluded that the challenged law was facially neutral because it applied to all ambulatory surgical centers and not just abortion clinics. *See id.* at 607.  The challenged Kentucky laws at issue expressly only apply to abortion facilities.

having to travel to other states to exercise their constitutional right to access abortion services. As a result, the burdens in this case far outweigh any benefits of the challenged regulations. Besides the significant factual distinctions between *Baird* and the case *sub judice*, this Court must consider *Baird*'s holding in light of the Supreme Court's decision in *Whole Woman's Health*. While *Whole Woman's Health* involved a challenge to the constitutionality of admitting privileges instead of transfer and transport agreements, the only significant distinction between *Whole Woman's Health* and the case at bar is that here Kentucky's regulation would eliminate, not just reduce, the availability of abortion services within its borders.

After considering the burden and benefit of the challenged Kentucky regulations, this Court is compelled to reach the same conclusion as the Supreme Court did in *Whole Woman's Health*: the challenged regulations impose substantial obstacles to abortion access and result in no benefit. Therefore, the challenged Kentucky statute and regulation are unconstitutional.[29]

### 2. *Facial Challenge*

While the evidence establishes that the challenged laws are unconstitutional as applied to EMW Plaintiffs and Planned Parenthood, the broader question of whether the statute and regulation are facially invalid remains. In a facial challenge, the challenging party is asserting that "no application of the statute could be constitutional . . . ." *Sabri v. United States*, 541 U.S. 600, 609 (2004); *see also Citizens United v. FEC*, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges is . . . both instructive and necessary, for it goes to the breadth of the remedy employed by the Court . . . ." (citation omitted)).

---

[29] Based on the Court's conclusions that the Kentucky laws violated EMW Plaintiffs and Planned Parenthood's substantive due process rights, it is unnecessary to rule on whether those laws violated the Fourteenth Amendment's Equal Protection Clause or constitute an unlawful delegation.

Facial challenges impose "a heavy burden" upon the parties maintaining the suit.  *See Gonzales*, 550 U.S. at 167 (citation omitted).  The U.S. Supreme Court has cautioned that where possible, courts should fashion injunctions narrowly, tailored to the facts of the case, "to limit the solution to the problem . . . ."  *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328 (2006).  Three interrelated principles should inform this process.  *See id.* at 329 (citation omitted).  First, a court should generally strive to nullify as little of a legislature's work as possible.  *See id.*  Second, a court should refrain from rewriting the unconstitutional law "to conform it to constitutional requirements . . . ."  *Id.* (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988)).  And "[t]hird, the touchstone for any decision about remedy is legislative intent.  . . . [T]he Court must ask:  [w]ould the legislature have preferred what is left of its statute to no statute at all?"  *Id.*

In *Ayotte v. Planned Parenthood of Northern New England*, the Supreme Court considered a facial challenge to New Hampshire's parental notification law.  *See Ayotte*, 546 U.S. at 323.  The law prohibited physicians from "performing an abortion on a pregnant minor (or a woman for whom a guardian or conservator has been appointed) until 48 hours after written notice of the pending abortion is delivered to her parent or guardian."  *Id.* at 323-24.  The law, however, did not contain a provision allowing for an emergency abortion where, in the doctor's medical judgment, a woman's health was in danger.  *See id.* at 324-25.

The question before the U.S. Supreme Court was one of scope.  New Hampshire conceded that application of the law to minors in emergency situations would run afoul of the Constitution.  *See id.* at 328.  At the same time, the state argued that because the number of minors who might be affected by the law's failure to provide for a medical emergency exception represented such a small percentage of cases, and because the law could be applied

constitutionally in the majority of instances, both the trial court and Court of Appeals went too far by invalidating the entirety of the law on its face. *See id.* at 331.

The Supreme Court concluded that invalidation of the entire law was too blunt a remedy. *See id.* The Court noted, however, that such facial invalidation was understandable given that it had previously invalidated the entirety of Nebraska's partial birth abortion ban because it too lacked a health exception. *See id.* at 330-31 (citing *Stenberg v. Carhart*, 530 U.S. 914, 930 (2000)). The *Ayotte* court distinguished *Stenberg* by observing that the parties had not advocated for "relief more finely drawn." *Ayotte*, 546 U.S. at 331; *see also Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 333-35 (6th Cir. 2007) (discussing the differences in the holdings in *Ayotte* and *Stenberg*).

Turning to the application of the factors set out in *Ayotte* to the present case, this Court first notes that the statute's scope is narrow, concerning only the requirement that abortion facilities have transfer and transport agreements. *See* KRS 216B.0435. While 902 KAR 20:360 in its various iterations deals with multiple issues relating to abortion facilities, the challenged portion—Section 10—directly relates to the specific requirement for transfer and transport agreements in implementing KRS 216B.0435. Thus, because this Court has already found that these agreements impose a substantial burden on a woman's right to seek an abortion while offering no medical benefit, there can be no excision of unconstitutional provisions as encouraged by the Supreme Court. *See Ayotte*, 546 U.S. at 329.

Second, the Court cannot rewrite these laws to make them constitutional. The evidence establishes how enforcement of the statute and the challenged portion of the administrative regulation will result in a substantial burden on women seeking abortions in Kentucky. This Court will not act as a legislative body and attempt to refashion the law so that it would not

create that burden. *See id.* Analysis of this factor therefore weighs in favor of facial invalidation.

As to the third *Ayotte* factor, the Chairman of the Kentucky House Judiciary Committee went on record to state that he did not believe the transfer and transport requirements would function as impediments to licensure if the statute were enacted. (Defs.' Trial Ex. DX25C, 40:07-44:33). Given that the current enforcement of the statute and administrative regulation has resulted in an impediment to licensure, the Court concludes that the Kentucky General Assembly that enacted KRS 216B.0435 would have preferred no statute at all. This factor therefore weighs in favor of facial invalidation.

Further, like the *Ayotte* court's distinction of *Stenberg*, the parties in this action have not requested a more finely drawn remedy. *See Ayotte*, 546 U.S. at 330-31. Rather, both sides have sought to uphold or strike down the statute and implementing regulation *in toto*. The Court concludes this too weighs in favor of facial invalidation.

Finally, while the statute existed for years with no impact on licensure, CHFS's subsequent actions reveal the law's constitutional infirmity. This is analogous to the issue in *Whole Woman's Health*, where a previous court had upheld the facial constitutionality of the Texas law. *See Whole Woman's Health*, 136 S. Ct. at 2300-01 (discussing *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583 (5th Cir. 2014)). The Supreme Court addressed whether the prior Fifth Circuit ruling constituted *res judicata* with respect to the plaintiffs' facial challenge. *See id.* at 2304-09. The majority concluded that the introduction of new facts resulting from a statute's enforcement permits a subsequent court to facially invalidate

a statute without offending principles of *res judicata*.[30]   *See id.* at 2306 ("The post[-]enforcement consequences of H.B. 2 were unknowable before it went into effect.").   Guided by this reasoning, this Court concludes that the unconstitutional effect of the enforcement of KRS 216B.0435 was likewise unknowable until the recent actions by CHFS leading to the present case.   This too weighs in favor of upholding the facial challenge to KRS 216B.0435.

Thus, the analysis in this instance compels a conclusion that KRS 216B.0435 is unconstitutional on its face.   Further, if KRS 216B.0435 is unconstitutional, 902 KAR 20:360 Section 10 is correspondingly facially unconstitutional.   Accordingly, the state must be permanently enjoined from enforcing any portion of KRS 216B.0435 and 902 KAR 20:360 Section 10.

## V.   ORDER

Based on the findings of fact and conclusions of law set forth above, **IT IS HEREBY ORDERED** as follows:

1.     The Court grants judgment in favor of EMW Plaintiffs on Count I of Plaintiffs' Verified Complaint, and Intervenor-Plaintiff on Counts I and II of the Intervenor-Plaintiff's Complaint.   KRS 216B.0435 and the transfer and transport agreement requirements in 902 KAR 20:360 Section 10 violate EMW Plaintiffs' and Intervenor-Plaintiff's substantive due process rights under the Fourteenth Amendment of U.S. Constitution, both facially and as applied, which render those laws void and unenforceable.

2.     Because the Court has determined that KRS 216B.0435 and the transfer and transport agreement requirements in 902 KAR 20:360 Section 10 are unconstitutional, the Court

---

[30] Facial invalidation was a particularly broad remedy in *Whole Woman's Health* because, unlike here, the Texas bill contained a severability clause and numerous other seemingly innocuous requirements that were enjoined as well.   *See id.* at 2353 (Alito, J., dissenting).

**DISMISSES AS MOOT** the claims asserted in Count III of Plaintiffs' Verified Complaint and Count IV of the Intervenor-Plaintiff's Complaint.

3.      Counts II and IV of Plaintiffs' Verified Complaint, and Counts III, V, and VI of the Intervenor-Plaintiff's Complaint are waived and are therefore **DISMISSED WITH PREJUDICE**.

**Greg N. Stivers, Judge**
**United States District Court**
September 28, 2018

cc:      counsel of record